Norwalk five days a week generally?

A. Yes.

Q. While at GE Capital, did you begin to work from home at all?

A. Yes.

Q. You were working at home on Fridays?

A. Correct.

Q. When did that start?

(Whereupon, an off the record discussion took place.)

(Whereupon, a recess was taken.)

(The last question and answer were read back by the court reporter.)

THE WITNESS: That started when I was given a position of director of support services, my contract position was taken away and part of the customer service position was an enticement that I could work at home on Fridays; and in fact, Danbury set me up with a

b0c68b7f-1de1-459e-85d6-6f1127d006d2

computer and all the important icons.

Q. When did this take place in terms of a month and year?

A. The commuting or change in positions?

Q. It sounds like they corresponded?

A. I was told in the spring of 2000 that I would be no longer having the position I held.

Q. Who told you that?

A. John Edel.

Q. Was this a meeting that just the two of you had?

A. Yes.

Q. Did this come as a surprise to you at that particular time?

A. Yes, absolutely.

Q. How many direct reports did you have?

A. I don't remember.

Q. Was this anybody other than Vicky and Sabrina?

b0c68b7f-1de1-459e-85d6-6f1127d006d2

direct and I took over the direct and they put her into the -- she was doing both.

Q. When you say they put her into the biotech, who's "they"?

A. It was at John's direction, but I don't know who he took his direction from.

Q. The arrangements for you to telecommute on Fridays or work from home on Fridays in terms of the setting up the computer so it was connected to the network or whatever you needed in that regard, you said GE did that. Who in particular are you talking about?

A. I think her last name is Harper, Cindy Harper. She headed up the acquisition group at GE as far as training us when Phoenixcor and GE were merging together. We had two teams working together once GE purchased us. She headed up the group from GE. She was the one that ensured I have this computer and made the arrangements.

Q. Did GE buy a computer for you?

A. No, I'm sure it was a reconditioned laptop.

Joan Kossoff

Q. But it wasn't your own?

A. No, I gave it back when I left.

Q. Did anybody from GE come out to your house to do any work there to help facilitate the ability to communicate?

A. No, they just made sure, you know, the modem was set up correctly, the phone number, et cetera, et cetera, no.

Q. Did you fill out any paperwork making a formal request to work out of your home?

A. I didn't make the request. I was told I could work from home by John. I never requested.

Q. How did you get from that point where Mr. Edel told you you could work from home to actually coordinating with Cindy Harper on the logistics of it?

A. He told me I needed to get a computer. Since she was always down in -- on follow-up's, she was my contact.

Q. Was Mr. Edel basically out of it at that point? When I say "it," I mean the

b0c68b7f-1de1-459e-85d6-6f1127d006d2

process of getting you hooked up so you could work from home one day a week?

A. Right.

Q. How did you end up working from home on Fridays as opposed to some other day of the week?

A. It doesn't matter. I said is that day okay. He said as long as we have your phone number and fax number, that's fine. It could have been Wednesdays, it didn't matter.

Q. Who selected Friday?

A. I selected Friday.

Q. Any particular reason why?

A. No.

Q. What were your work hours at the time that you first took over as director of support services?

A. It was a 37 and a half hour work week.

Q. Did you have a regular starting time and stop time?

A. I used to get in about 7:15 in the morning, between 7:00 and 7:15.

Q. Then you left around 4'ish?

Joan Kossoff

A. I left around 3:00, 3:30, I took no lunch.

Q. Was that the normal working hours for the other folks who worked in the -- that area?

A. I have no idea. I was the only one that worked in that area in my location.

Q. Did you have to get any sort of approval to work those hours?

A. It was flex time hours. I was told by John as long as I put in my 37 and a half hour work week or 40 hour work week, I was fine.

Q. When did he tell you that?

A. I don't recall.

Q. Had you been working those same hours, roughly 7:15 to 3:30, as the director of contracts?

A. I worked either those hours or I worked, until nine o'clock at night. It was either/or. It was either working beyond the commuting time or coming in extra early and doing the four o'clock, 3:30, four o'clock

Joan Kossoff

Q. What day of the week did you go to the one in New Jersey, days I should say?

A. I don't remember, I think it was Monday and Wednesday, I don't recall. Sometimes just once a week if it was too difficult and I had to be at work. I can't recall.

Q. Did you ask Mr. Edel for his approval to leave to go to your physical therapy sessions or was it that you just came in early so it didn't matter?

A. It didn't matter, I was on flex time.

Q. Did you tell Mr. Edel when you were going on physical therapy sessions?

A. I don't remember.

Q. Do you recall whether you told him at all that you were going through physical therapy?

A. I must have told him. I told Chris Wright, I was training her, she knew I had to leave earlier certain days. She was very aware.

Q. Did Mr. Edel ever state any

b0c68b7f-1de1-459e-85d6-6f1127d006d2

sort of objection to you leaving earlier for you to attend physical therapy?

A. Never.

Q. Did Mr. Edel ever say anything to indicate he felt your condition with your back and your sciatica was interfering with your performance of your job?

A. No.

Q. Did Mr. Edel ever express any concern to you about your flexible hours?

A. No. His only concern was I had a phone in case they had to call me. I had a separate line brought in.

Q. Did he ever express concern to you about the fact you were working at home on Fridays?

A. No.

Q. When you changed jobs from director of contracts to director of support services, I believe you said Vicky Holmes went over to work on the biotech portfolio; is that right?

A. Yes.

Q. Was Sabrina still there at the

news.

Q. What happened in terms of your responsibilities when Ms. Wright went out on maternity leave?

A. I continued with them.

Q. You assumed some additional duties?

A. I assumed Chris's work.

Q. How did that come to pass?

A. Chris mentioned it would be a good idea because it was a piece of cake. I said I know that. I took on my old responsibilities, plus liaison work she was doing legally. I sat with her for about a week or two before she left.

Q. What was the purpose of that?

A. To get me comfortable with who she corresponded with, who she spoke with, what she looked for.

Q. Was Mr. Edel made aware of the fact you were going to be assuming these duties?

A. Yes.

Q. He signed off on it?

b0c68b7f-1de1-459e-85d6-6f1127d006d2

A. Yes, he did.

Q. Did you have any discussions with him about any -- any particular discussions you recall about your assuming Ms. Wright's duties when she was out on maternity leave?

A. I came in on Fridays, I didn't stay at home.

Q. You had to be in every day?

A. Yes.

Q. Did you know at the time Ms. Wright went out how long she anticipated her maternity leave to be?

A. Yes.

Q. How long was that?

A. It was supposed to be September -- three months. She was coming back December, the end of December. She was going to be out for a three-month period.

Q. In terms of the duties that Ms. Wright had been handling that you assumed, what were they, what did you specifically pick up to fill in for her?

A. Basically if a contract would

b0c68b7f-1de1-459e-85d6-6f1127d006d2

Joan Kossoff

Kossoff Exhibit 1 for identification.)

Q. The reporter has just marked as Exhibit 1 to your deposition a one-page document with a Bates number of 438. At the top it says Job Title: Manager, vender support group. Can you take a look at this, a document you produced to us, and tell us if that's a description of your current job at Sterling?

A. That is a job description of my current job that my boss wrote.

Q. When did you first receive a copy of this job description?

A. When I first started working there.

Q. Do you mean when you first started working there as a temp or permanent employee?

A. Permanent.

(Requisition/Posting marked Kossoff Exhibit 2 for identification.)

Q. The reporter has marked as Exhibit 2 to your deposition, I'm handing you

b0c68b7f-1de1-459e-85d6-6f1127d006d2

that document, a one page Requisition/Posting form with Bates number 394. If you could, please take a look at this document and tell me whether you've seen it before?

A. I've never seen it.

Q. This was produced to us by your counsel, which I assume the document came from you, is this something in your files and you may not recognize?

MS. PAES: For clarification, Counsel, it was in a package of documents all in order that you provided to us through CHRO, the CHRO complaint.

MR. PEIKES: This was part of the CHRO filing?

MS. PAES: Yes.

Q. Before now you had never seen this document?

A. No.

Q. Did you review the papers submitted by the parties to the Connecticut Human Rights Commission?

A. I don't remember what I

b0c68b7f-1de1-459e-85d6-6f1127d006d2

reviewed, but I did not see this in detail.

Q. If you could review the description of Principal Duties and Accountabilities? Based on your knowledge of what Ms. Wright was doing, does that appear to describe her position?

A. I was doing a lot of this. I interfaced with the T and A's, I did the T and A's, transferring, that was part of my position. Chris, as far as I know, did not do that. I don't recall her working in administering workouts and defaults.

Q. Is that something you did?

A. I would get the files for them. I don't think Chris worked on that, I could be wrong. The questions of carry out on direct transactions, that was me. She didn't do that.

Q. Were these tasks you described that you said were your responsibility, were they your responsibility as the director of contracts, as the director of support services or both?

A. Both. The servicing of the

b0c68b7f-1de1-459e-85d6-6f1127d006d2

existing portfolio was something that I was supposed to be doing throughout. She did not do anything on the existing Phoenixcor portfolio, I did. Chris only worked on new business.

Q. Do you know what Ms. Wright was doing, in what way her job changed, if at all, after you left the company?

A. I have no idea.

Q. So she may have picked up these functions after you left?

A. I don't know.

Q. What about the first bullet point, "review third party form documents for acceptability as assigned transaction from a legal issue standpoint," do you know what that is?

A. When we would buy somebody else's paper, she would have to make sure that it met certain requirements we looked for on documentation.

Q. What type of requirements?

A. As far as reps, warranties, defaults, if documents were signed in a certain

way. There was a form we used for third party review and you had to meet certain parameters.

Q. If the third party document didn't meet those parameters, would you post changes?

A. It would go to legal.

Q. Is that something you would have been doing prior to the change in your job?

A. Sabrina Walker did that when she would get the documents in. She was the third party assistant. She filled out the sheet.

Q. The first bullet point is not something you did as director of contracts?

A. No.

Q. The second bullet point says "review direct transactional documents generated from the third party group, Norwalk; assist and opine on legal issues or interface with CEF Danbury, legal representative knowledgeably." Do you have any idea what that is?

A. No.

b0c68b7f-1de1-459e-85d6-6f1127d006d2

Q. Is that something you --

A. Review direct transactional. Direct is documents -- my interpretation is direct transactional is documentation for a broker on our paper. That's what that means. I reviewed that all the time when we had to use their name on our documents.

Q. What about the second piece of that, assist and opine on legal issues or interface with CEF Danbury?

A. I didn't do that at Phoenixcor. I would interface with Danbury ongoing with legal issues, with Peggy Nebs on the Phoenixcor portfolio. When I was at Phoenixcor, I interfaced with Al Kolb.

Q. The third bullet point says "interface with customers or third party intermediaries on legal and business issues." Was that part of your job as director of contracts?

A. Yes.

Q. Did you have to do that as the director of support services role?

A. Yes.

b0c68b7f-1de1-459e-85d6-6f1127d006d2

Joan Kossoff

Q. The next task is "review and approve final booking on biotech schedules." What does that mean?

A. That means that once the contract came in and all the I's were dotted and T's crossed and all of the necessary documentation was in order, paperwork was prepared and we would go into John for sign-off. I would sign off on wires. That's what that means basically, making sure the paperwork is in alignment with what's required.

Q. Was this something you were doing as director of contracts?

A. Absolutely. This is what I taught her how to do also.

Q. You mentioned in the next bullet point "Assist in servicing (EG transfers and assumptions.) Existing portfolio of approximately $1.1 billion." Is that referring, as best you can tell, to the existing Phoenixcor portfolio?

A. I would think so.

Q. Does $1.1 billion sound about right in describing the size of the Phoenixcor

portfolio?

A. I don't remember.

Q. The next one is "assist in administering workouts and defaults and interface with CEF Danbury portfolio group." Is that something you had done as director of contracts?

A. I had done that as -- I did that as support services when I was working with Danbury. As far as we would assist, we would get the contracts up to Danbury, they had their own workout department. That was not something done down in the Norwalk division. Maybe the credit was, but the pulling and getting them documentation, what they needed, that was Danbury, so ...

Q. What about the next one, "handle miscellaneous requests for special documents and questions on carryover of direct transactions"?

A. That was part of my position. I was the one that had to do the contracts on all existing lines that were left open. I don't know what else that encompasses, what it

b0c68b7f-1de1-459e-85d6-6f1127d006d2

meant.

Q. Do you know what carryover of direct transactions is?

A. The only thing I think of is deals we were still involved in because they were not dispersed to other regions.

Q. The next bullet point says "assist in supervising doc specialists," who are the doc specialists?

A. Doc specialist was Vicky and Sabrina.

Q. You supervised them as director of contracts?

A. Yes.

Q. But you would not supervise them as director of support services?

A. No, I did not.

Q. Then it says "performing administrative tasks, EG, reviewing and sorting legal notices." Is that something you had done in the past?

A. I have no idea what that means, no, I did not do that. The only thing I can say is if a bill would come in regarding a

b0c68b7f-1de1-459e-85d6-6f1127d006d2

bankruptcy, she would send it to the right person. I don't know where else that would go.

Q. The manager listed for this position are John Edel and Jim Siegal. What is Jim Siegal?

A. A gentleman that was in charge of Hunt Valley. I told you half was under Jim and the other half was under John.

Q. At the bottom of this form it says "If replacement, who is being replaced. Albert Kolb." Is that your understanding, Ms. Wright was hired to replace Mr. Kolb?

A. My understanding was they couldn't hire another Al Kolb, so they needed somebody with legal background.

Q. Ms. Wright's position was described to you as basically a newly created position?

A. It wasn't described like that. It wasn't newly or replaced, it was just told to me since they could not hire a lawyer and have in-house counsel, they would hire someone who had legal background, paralegal background and she would become director of contracts in

b0c68b7f-1de1-459e-85d6-6f1127d006d2

addition to that.

Q. In your complaint you had alleged that when you took over for Ms. Wright's -- when you assumed Ms. Wright's duties in her absence on her maternity leave, you observed there were some minor differences between your job as supervisor of contracts, or director of contracts, and Ms. Wright's job as the manager of contracts. What were those minor differences that you observed?

A. I believe she was not as heavily involved in the documentation preparation where I assisted them more.

Q. Anything else, any other differences you observed?

A. No.

Q. Okay. You also allege that based on your experience filling in for Ms. Wright, you came to the conclusion that her job was saved for that minor difference you just attested to, essentially the same as yours had been for director of contracts; correct?

A. Right.

Q. Did you ever express that

b0c68b7f-1de1-459e-85d6-6f1127d006d2

A. Sure.

Q. Who are they?

A. John Edel, Vicky Holmes-Sells, Sabrina Walker, Tom Williams, who else was there? Let's see. Bob Dion.

Q. Bob who?

A. D-I-O-N.

Q. Anybody else who you believe perceived you as disabled at GE Capital?

A. It's very obvious when you walk around with a brace you're disabled.

Q. Did Mr. Edel ever do or say anything to suggest to you he perceived you as disabled other than what was written in the performance appraisal?

A. Speak to me directly about it.

Q. Anything you're aware of that he suggested to you that he perceived you as disabled?

A. Yes. When I was given the position in support services and he told me that I could work from home, that had a lot to do with the disability. He felt it would be easier on me, less commuting would help.

b0c68b7f-1de1-459e-85d6-6f1127d006d2

Q. That was true, though?

A. I'm answering your question.

Q. That was true, though, in terms of your commute, to be able to work from your home one day a week?

A. Absolutely.

Q. Is there anything else Mr. Edel said or did to suggest that he perceived you as disabled?

A. To do that one must be perceived as disabled.

Q. Is there anything else, though?

A. No.

Q. What did Ms. Holmes-Sells say or do to suggest to you that she perceived you as disabled?

A. I don't remember.

Q. What about Ms. Walker, what, if anything, did she say or do to suggest that she perceived you as disabled?

A. When I was going for magnets, she made a couple of comments.

Q. Along the lines of?

b0c68b7f-1de1-459e-85d6-6f1127d006d2

Joan Kossoff

A. That was not discussed.

Q. Paragraph 22 you allege "In or about June of 2001 Plaintiff was informed by a co-worker that her duties were going to be transferred to St. Louis, Missouri." Is this the e-mail you testified about earlier?

A. Yes.

Q. In your interrogatory responses I believe you identified the co-worker as Mr. Dunn?

A. Yes, Jim Dunn.

Q. Was it his e-mail you received or --

A. I don't remember, I do remember speaking with him, asking him in fact what he knew. He was very vague.

Q. In paragraph 24 it says "In or about August of 2001 Plaintiff was told by Edel that Defendant was concerned about her telecommuting on Fridays because Jennifer Sherry (under the age of 40, not disabled) from the human resources department did not have a way to know if Plaintiff was working while at home." Is that an accurate depiction of the

b0c68b7f-1de1-459e-85d6-6f1127d006d2

conversation you had with Mr. Edel?

A. Yes, that's very accurate.

Q. Where were you when you had this discussion?

A. I was in my office when John spoke with me.

Q. What was your response to what Mr. Edel told you?

A. I was very upset.

Q. How did you express that?

A. I let him know that I was very upset, and he listened, and I started coming in in September on Fridays when I took over for Chris.

Q. The reason you were given that you needed to be in the office on Fridays was because of the fact you were filling in for Ms. Wright?

A. Correct.

Q. Are you aware of any other reason why you were required to come into the office on Fridays at that point?

A. Because of the nature of the position.

b0c68b7f-1de1-459e-85d6-6f1127d006d2

Joan Kossoff

Q. But is there anything else you believe was another reason? Do you have any reason to believe that when you were told that you needed to come in on Fridays, and that it was because you were assuming responsibilities that previously had been handled by Ms. Wright, that someone was lying to you?

A. I don't understand what you mean.

Q. Did Ms. Wright's responsibility -- were they of the sort that you -- were Ms. Wright's responsibilities of the sort that you needed to be in the office every day?

A. Yes, and I started also a little before she left to make everybody comfortable. Supposedly there was mistrust, according to John, on Jennifer's turf that I wasn't doing the work at home on Fridays.

Q. Did you ever speak to Ms. Cherry about that?

A. No, I did not.

Q. Paragraph 27 you say "In or about September 2001 Edel told Plaintiff he had

b0c68b7f-1de1-459e-85d6-6f1127d006d2

you had emphysema?

A. I knew I was always getting bronchitis, there was a problem. So, no, most smokers do have it, they don't label it. They call it other names which don't mentally impact you as much.

MR. PEIKES: I'm going to take a minute if you don't mind.

(Whereupon, a recess was taken.)

MR. PEIKES: Can you mark that.

(E-mail dated May 29, 2000 marked Kossoff Exhibit 10 for identification.)

Q. Ms. Kossoff, the reporter has just marked as Exhibit 10 to your deposition an e-mail or a copy of an e-mail from Resolve Announcement. It says to CEF, all US personnel, dated Monday, May 29, 2000. The subject is important Resolve information, please read. Can you read that e-mail and tell me whether you've ever seen it before?

A. If I had seen it, I don't

b0c68b7f-1de1-459e-85d6-6f1127d006d2

recall reading it. It might have been also when we were switching over systems when we were going from Phoenixcor to GE when we weren't getting all the e-mails. This might have been that point in time.

Q. Reading this, though, does that refresh your recollection one way or the other as to whether you saw it?

A. Not at all, no.

MR. PEIKES: Please mark this.

(E-mail dated May 30, 2000 marked Kossoff Exhibit 11 for identification.)

Q. Ms. Kossoff, the reporter has just marked as Exhibit 11 to your deposition an e-mail from you to Resolve Announcement dated Tuesday May 30, 2000 at 8:42 a.m. Subject, important Resolve information, please read. This e-mail indicates the message was read by you on May 30, 2000 at 8:42 a.m. Do you have any reason to believe that's inaccurate?

A. I'm sure it's accurate, but I don't remember.

Kossoff 10
EXHIBIT
8-7-03 N

-----Original Message-----
**From:** Resolve Announcement (CAP, CEF)
**Sent:** Monday, May 29, 2000 8:19 PM
**To:** @CAP CEF All US Personnel
**Subject:** Important Resolve Information: Please Read!
**Importance:** High

You will soon receive printed material announcing a new employee issue resolution program, RESOLVE, effective June 1, 2000, for US-based employees of GE Capital and its subsidiaries. This program focuses on settling work-related conflicts internally and, if necessary, with the assistance of external dispute resolution experts. Attached is an electronic version of the RESOLVE Handbook. You can also find the handbook, RESOLVE Guidelines and other information on the RESOLVE web site, located under Employee Services on CEF NET. Please review all these documents so that you can fully understand your rights and obligations under this new program. If you have any questions, please contact your Human Resources Representative.

<< File: handbook.doc >>

Kossoff II
EXHIBIT
8-7-03 M

-----Original Message-----
**From:** Kossoff, Joan (CAP, CEF)
**Sent:** Tuesday, May 30, 2000 8:42 AM
**To:** Resolve Announcement (CAP, CEF)
**Subject:** Read: Important Resolve Information: Please Read!
**Importance:** High

Your message

To: @CAP CEF All US Personnel
Subject: Important Resolve Information: Please Read!
Sent: 5/29/2000 8:19 PM

was read on 5/30/2000 8:42 AM.