UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOAN KOSSOFF,

               Plaintiff,           Civ. Action No. 3:03CV00203(PCD)

    v.

GENERAL ELECTRIC CAPITAL CORPORATION,    DATE: March 22, 2004

               Defendant.

## PLAINTIFF'S MEMORANDUM IN OPPOSITION

Plaintiff JOAN KOSSOFF hereby files this Memorandum in opposition to Defendants' Motion for Summary Judgment. Contrary to what is stated in Defendant's motion for summary judgment there is more than sufficient non-disputed evidence and facts to prove each of Plaintiff's counts in this matter. In addition, as detailed below, Defendant has once again ignored this Courts Supplemental Order for Motion Filing Procedure. As such, the motion should be denied, with prejudice.

**ORAL ARGUMENT REQUESTED**
**NO TESTIMONY REQUIRED**

## I. PLAINTIFF'S STATEMENT OF FACTS

Plaintiff Joan Kossoff is a 62 year old female. She suffers from Sciatica, and is materially restricted in many daily life functions, including sitting, standing, driving (Kossoff at 97-100 et seq.). She first became associated with Defendant when Defendant acquired Phoenixcor, Inc. ("Phoenixcor") in or about April of 1999. Ms. Kossoff was Director of Contracts for Phoenixcor at the time of Defendant's said acquisition. She managed the contracts department for all three of Phoenixcor's lines of business, i.e. direct lending, biotech, and third-party broker lending (Kossoff deposition at 64-66, 79-80). She was able to perform all essential functions of her position. The facts also show that Kossoff was perceived as disabled by Defendant (Edel at 71, Kossoff at 91-100, Cherry at 34).

As a result of Defendant's acquisition, it laid off a substantial number of employees, and additional employees left voluntarily (GE 00097-000111 - Exhibit A). Defendant's documents indicate that Dan Wieneke (over the age of 40), Ms. Kossoff supervisor, was terminated by Defendant (Exhibit A). According to Defendant, Al Kolb, an in-house attorney, who was responsible for "providing legal review of Phoenixcor's deal documentation", resigned in the year 2000 (Kossoff at 83-84, Edel at 18). Defendant has proffered no evidence to substantiate Kolb's job duties.

At the same time, Defendant "eliminated" Ms. Kossoff's position, and created a position of Contracts Manager, and demoted Ms. Kossoff to Support Services Manager or Director in April of 2000. Defendant stated that paralegal degree and experience was a prerequisite for the position (Edel at 19, and document Bates stamped 00394 - Exhibit B), and hired Christine Wright a non-age-protected, not disabled female for the position. Ms. Kossoff was not given a choice of applying for

2

the Contracts Manager position. Edel, the hiring manager, told her she was not qualified for the job, because she was not a paralegal (Edel at 112 and 113).

However, this new position was, in fact, substantially similar to Ms. Kossoff's former position, and paralegal training was not essential (Kossoff at 218). Ms. Kossoff's and Wright's jobs had "essentially the same responsibilities" (Edel at 20) - there were no substantive differences in the two positions (Kossoff at 226-227). Kossoff trained Wright for the position over a three-month period (Kossoff at 115). Kossoff also satisfactorily fulfilled Wright's duties while she (Wright) was on maternity leave (Edel at 9-10, Wright at 66-67), while at the same time performing all duties of her other position (Kossoff at 121, Wright at 65). In contrast to Wright's training, Ms. Kossoff needed only about an hour or two of training in order to assume all her duties (Wright at 67). Defendant has testified that it was not Wright's paralegal certification or degree, but rather her prior job experience that qualified her for the position (Edel at 57). Although she did not have to closely supervise Wright's employees (Kossoff at 123), she did supervise them (Wright at 64, 66, 68). - significantly, Defendant denied to CHRO that she had supervised (Defendant's CHRO Position Statement at 4, 00386 - Exhibit C). Kossoff also negotiated contracts (Kossoff at 124) and rarely had to ask counsel for advice (Kossoff at 124) - in contrast, when Wright first started, she went to the general counsel most, if not all of the time (Wright at 59). Ms. Kossoff was surprised that Wright's job was essentially the same as hers had been, when she had an opportunity to actually do Wright's job (Kossoff at 138-140).

When Ms. Kossoff was shifted to her Director/Manager of Support Services job she was told that she would be able to telecommute one day per week in that position in order to entice and induce her to accept that position (Kossoff at 81). Jennifer Cherry (under the age of 40, no known

3

or perceived disability) alleged under oath on behalf of the Defendant to the CHRO that she denied knowledge or information "sufficient to form a belief as to the truth of the Complainant's allegation that she was granted permission to telecommute one day per week by some unnamed individual" when in fact she alleged at deposition that she knew through her employees (either Cindy Harper or Tamara Miron - Defendant's CHRO Answer at #11 - Exhibit D, Cherry at 34-36). With regard to telecommuting Cherry and Defendant denied knowledge of anyone telling Ms. Kossoff that she (Cherry) objected and said she did not have any way to know whether or not Ms. Kossoff was doing any work on Friday (Defendant's CHRO Answer at #18 - Exhibit D), when Edel, who identified himself as Senior Vice President of Risk (Edel at 8), testified he had in fact been questioned by Cherry (Edel at 44). In fact, Edel (at 45) and Cherry (at 38-39) both testified that neither of them had any problem communicating with Kossoff when she was working from home, nor had any other employee made any such complaint. In addition, while Defendant admits that it helped install a computer and modem in Kossoff's home for her telecommute (Kossoff at 89-90), and was able to monitor remote computer use (Cherry at 40). Defendant later discontinued Ms. Kossoff's right to telecommute, on the basis that Cherry did not have a way to know if Kossoff was working while at home (Kossoff at 183-184), although the facts show that Defendant was able to communicate with Kossoff both by phone and email, and that no one had ever had problems reaching Kossoff at home (Edel at 42, Cherry at 38-39). Defendant was able remotely to monitor Kossoff's home computer use, although it did not do so (Cherry at 40).

When Defendant created the position of Manager of Support Services, it intended the position to be only a temporary one (Cherry at 144, GE 00052 - Exhibit E). Nevertheless, it was presented to Kossoff as a permanent position, in part to induce her to accept the position (Edel at 88).

4

Defendant claims that Kossoff's new position was equivalent to that of a Portfolio Administration Representative (PAR). This is not true. Kossoff, in addition to all PAR duties, also had substantial additional duties, which included UCC filings, title tracking, analysis and decision-making (GE 00050 and 00052 - Exhibit E and F). Significantly, Defendant's notes state in relevant part "PAR's find out prob[lem] and transfer prob[lem] to region where Analyzation and decision is made <u>Joan</u> keep to analyze and make decisions, Business Center doesn't do that" (GE 00050 - Exhibit E). Significantly, also according to Defendant's own documents received through discovery, Defendant classified Kossoff not as a PAR, but as a "Contracts Manager" (GE 000204 - Exhibit G), and their attempts to classify her as a PAR to the Commission on Human Rights and Opportunities and here (Defendant's Memorandum at pp 4 and 5, Defendant CHRO Position Statement at page 3 - Exhibit C) was and is a deliberate attempt to mislead a factfinder. As their own documents show, Ms. Kossoff was in the middle of the salary spread for contract managers, with one at $77,009, Ms. Kossoff at $81,293 and a third at $84,165 (GE 000204 - Exhibit G). According to Defendant's own documents, Ms. Kossoff's compensation level was not elevated, as it contended, and contends.

In or about September of 2001, Ms. Kossoff asked Edel about her annual raise (Kossoff at 181). Edel told her that he had put in for a raise (Edel at 61). Defendant had earlier denied, under oath, that this had taken place (Defendant's CHRO Answer 22 - Exhibit D).

In or about June of 2001, Ms. Kossoff approached Edel, because a colleague had shown her an e-mail stating that the Phoenixcor portfolio was being transferred to St. Louis and asked him whether the transfer would affect her job (Kossoff at 47). Edel told her that her position was fine - "they were not transferring my duties out there" (Id). In July or August of 2001 Ms. Kossoff was asked to pack up files of her portfolio and transfer them to St. Louis (Kossoff at 48). At that time,

5

Ms. Kossoff again approached Edel to ask about the status of her job. Again, she was told that her job was safe (Kossoff at 49), despite the fact that the decision had already been made that she was to be terminated (Defendant's CHRO Schedule A answers #11a, exhibit H, and Edel at 86). In fall, Kossoff asked again and further asked him to talk with human resources. Edel said he would, and later said that she (Cherry at human resources) did not reply to him, evading Kossoff's questions (Kossoff at 50-51). According to Ms. Kossoff, she was finally told she was being let go in or about December 2001, after having been deceived for about five months by Defendant (Kossoff at 53). Because of this deception, she did not know she had a need to look for other jobs within Defendant's organization, nor did she have a need to look for work outside Defendant's organization (Kossoff at 44-46).

Ms. Kossoff was terminated on or about February 1, 2002 (Defendant's Position Statement to CHRO, page 5 - Exhibit C). When she was terminated, she was not given a variable incentive compensation (VIC) bonus to which she was entitled (Kossoff at 109). The payment she did receive was for staying and helping to put the portfolio to bed in St. Louis (Kossoff at 110, Cherry at 149) - termed by Defendant as a "stay bonus". It was not for all the work she had done in 2001. Kossoff also was not given, as promised, and as required in Defendant's personnel policy for those affected by the acquisition, information about open GE and GE Capital positions (Cherry at 147). Kossoff also was not able to view her personnel records upon first request (Kossoff at 191), and when she finally was allowed to do so several months later (Kossoff at 192), she found a document which stated "health and commuting issues could be limiting factors in placing elsewhere". Kossoff had not noticed this statement containing medical information previously, and did not know that it was in her personnel file. Defendant does not keep its medical records on employees in a separate locked

6

file, apart from personnel records, as required (Cherry at 28, Kossoff at 192).

## II. LEGAL ARGUMENT

### A. STANDARD OF LAW FOR SUMMARY JUDGMENT

In a motion for Summary Judgement, the court must review all of the evidence in the record, drawing all reasonable inferences in favor of the non-moving party, ... although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe" Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 135, internal cites omitted.

### B. DISABILITY DISCRIMINATION

To survive a motion for summary judgment on a discrimination case under the ADA, a plaintiff must establish a *prima facie* case, by showing: (1) he/she is "disabled" within the meaning of the ADA; (2) he/she is otherwise qualified to perform the essential functions of his/her job; and (3) he/she suffered adverse employment action because of his disability. Cole v. Roadway Express, Inc., 218 F.Supp.2d 350 (W.D. N.Y. 2002).

As demonstrated in this memorandum, Plaintiff is disabled under the ADA, and also was perceived as disabled by the Defendant. Plaintiff also was able to perform all functions of the Position of Manager of Contracts, and in fact did so when Christine Wright was on maternity leave (Wright at 65-67, Kossoff at 121, 124-125, 131-136). Plaintiff shows numerous adverse employment actions as a result, including: not receiving the position of Manager of Contracts, being denied an earned raise in 2002, being denied a bonus which she had earned, having her telecommuting discontinued, and being terminated.

Under the McDonnell Douglass shifting framework, the Plaintiff must support an inference

7

of pretext for any alleged legitimate, non-discriminatory reasons raised by the Defendant (Id.). Pretext is provided by showing that the employer's proffered explanation is unworthy of credence, and thus provides a pretext of discrimination. The facts in this case clearly show that any reasons offered by Defendant for its actions are nothing more than pretext for its discriminatory actions. As such, Defendant has not even approached its burden to sustain its motion, which should be dismissed in its entirety.

## 1. KOSSOFF IS DISABLED UNDER THE AMERICANS WITH DISABILITIES ACT

Contrary to the allegations of Defendant, Ms. Kossoff clearly is disabled under the Americans with Disabilities Act (ADA). Under the ADA, a person is disabled when he/she suffers from an impairment that substantially limits one or more major life activities. 42 USCA 12102. EEOC regulations define "substantially limits" to mean, in part "significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life function. 29 CFR 1630.2j(i-ii).

In Abbrasi v. Herzfeld & Rubin, 1995 WL 303603 (S.D.N.Y. 1995), the plaintiff listed the essential functions of his job as "the administrative duties of filing, organizing and research". He listed as major life activities impaired as [p]laintiff's substantially limits his ability to work or to engage in physical activity"; [p]laintiff can no longer engage in any overly strenuous physical activity and his physical regimen is limited to walking daily and and [sic] he is instructed to avoid lifting heavy objects"; as well as plaintiff can no longer walk up flights of stairs, stand for long periods of time, or carry heavy boxes or files. Abbrasi at 2. The court held that this was sufficient to claim that his major life activities had been limited pursuant to the ADA.

8

Ms. Kossoff, whose job activities are physically similar to those of Abbrasi, showed very similar limitations, including:

1. <u>Standing</u>; "In my case the disk problem where your – in my case the disk disintegration and they become unhinged and it's difficult standing for long shots" (Kossoff deposition at 97).

2. <u>Sitting and Driving</u>: Kossoff had to work "off hours" at work due to numbness (98). At times, she was physically incapable of driving to work, and her husband had to drive her (98). She could not sit at her desk for long periods without having to stand up and walk around (99-100).

3. <u>Work Hours</u>: Kossoff had to change from normal work hours due to her disability, and had to undergo physical therapy during work hours (102), up to two times per week (104).

As such, she clearly was disabled under the ADA.

## 2. KOSSOFF WAS PERCEIVED AS DISABLED BY DEFENDANT, AND AS SUCH, QUALIFIES UNDER THE ADA

Beyond the existence of her actual physical disabilities, Kossoff was clearly perceived as disabled by Defendant, as has been alleged in the Amended Complaint. As Defendant admits, her March 2000 evaluation contained a statement that stated "health and commuting issues could be limiting factors in placing elsewhere" (Amended Complaint, paragraph 45, Edel at 71). At his deposition, Edel testified that he felt he "was doing her (Kossoff) a favor" by writing that statement (Edel at 71). The plain language of this statement clearly show that Defendant felt Kossoff had physical limitations that prevented her from obtaining other positions within the company.

In his deposition, Edel tried to make it seem as if both Kossoff and he opposed her working at any other location, saying she "objected" to any change. This is not the case. As cited in Defendant's motion, Kossoff stated that she would have to move if there were a transfer - she never said she objected to this. Edel's actions, and Defendant's clumsy attempt to color Kossoff's

9

testimony is a clear showing of perception of disability by the Defendant.

Kossoff's testimony further shows Defendant's perceptions of Kossoff's disabilities:

1. Without her asking, Kossoff was told by Edel that she could work from home, and Defendant helped set up her work station in her home with a computer and modem (Kossoff at 89-90).

2. Defendant arranged for Kossoff to work flex hours due to her physical disabilities (Kossoff at 91 - 92). Her flex time was arranged because of her regular need for physical therapy (96), her driving limitations due to her sciatica (96), and the knowledge of her wearing a back brace and her diagnosis of sciatica (96- 97).

3. Kossoff has to take pain medication while at work, presumably in the presence of her co-workers (Kossoff at 100).

The facts in this case show that Defendant perceived Ms. Kossoff as disabled, and as such, its motion for summary judgment on this issue should be denied.

### 3. ADVERSE EMPLOYMENT ACTIONS

### CONTRACTS MANAGER POSITION

Defendant claims that Kossoff was not qualified for the position of Contracts Manager, although the record clearly shows otherwise. Defendant claims that a paralegal certification was a prerequisite for the position, and that as such, Kossoff was not qualified (Kossoff at 216, Edel at 19). However, the facts show that Kossoff clearly was qualified for the position, and that a paralegal certification was not needed:

1. When asked whether a non-paralegal could perform the position, Edel did not say it was - rather that "it was a level of business experience and my comfort with the position" (Edel at 57).

2.  Kossoff's and Wright's jobs had "essentially the same responsibilities" (Edel at 20 - there were no substantive differences in the two positions (Kossoff at 226-227). Defendant claimed that the new position included negotiating certain limited terms of documents with clients (Edel at 20-21). But when repeatedly pressed for any specific examples of terms she could negotiate, or any times when Wright in fact did this, Defendant could not suggest any (Edel at 22-25). Other than that, Defendant admitted there was no difference in the positions (Edel at 26). Edel could not recall if he ever even asked Wright if she had any prior experience in negotiating with clients at her prior job - only that she was a paralegal, and had worked with similar documents (Edel at 28-29) in prior jobs.

3.  The job description (Exhibit B) did not list anything about negotiating contracts. When asked where that was included, Edel pointed to "(R)eview third-party form documents from a legal issue standpoint", claiming that phrase "implied" negotiating (Edel at 103). Edel also admitted that Ms. Kossoff had performed such reviews of legal notices, and did "interface with customers" on these issues (Edel at 105). Kossoff did, in fact, negotiate such documents with clients (Kossoff at 124).

4.  When asked how Ms. Kossoff was unqualified to perform the duties listed in the job description, Edel stated "she never had the duties of being the negotiator" - not that she was lacking in legal skills (Edel at 53). Edel also refused to give a straight answer to how a paralegal degree itself was essential for the position (Edel at 52-59).

5.  Kossoff trained Wright over a three-month period (about one third of Kossoff's time during these three months was devoted to training Wright) (Kossoff at 115), and continued consultations even after this period (Kossoff at 117). The only other substantial training

11

Wright had was a two or three day training session for computer systems (Wright at 55).

6.    Kossoff fulfilled Wright's duties while she was on maternity leave (Edel at 9-10), without any complaints as to her performance (Kossoff at 217, Edel at 60). She was able to perform all Wright's duties, including legal work and negotiations (Wright at 66-67, Kossoff at 124-125, 131-136), while at the same time performing all duties for her other position (Kossoff at 121, Wright at 65). Wright told her the position would be "a piece of cake" (Kossoff at 121, Wright at 67). No paralegals or attorneys were brought in to assist Kossoff (Edel at 60). Plaintiff specifically stated that she did not apply for the position because she believed Edel when he told her that the position was changing, and that paralegal experience was a necessary prerequisite for the position (Kossoff at 216). As such, it is clear that the requirement of a paralegal degree was not a necessary requirement for the position, but rather pretext for the Defendant to take away Kossoff's position, and not consider her for the new position.

Kossoff specifically testified that she felt her denial of the contracts manager job was discriminatory, based upon the fact that she was qualified, and the person selected over her, Christine Wright, was younger and not disabled (Kossoff at 227-228). The showing of pretext also goes to the issue of Defendant's bad faith. Here also, Defendant's job description (Exhibit B) stated that the position was a replacement for Al Kolb - yet according to Defendant's own documents, it was, at least, a combination of Ms. Kossoff's and Kolb's job (which has never been specified by Defendant, and, according to Defendant, an attorney could be totally replaced by a paralegal - while the facts show that this new position was substantially similar to Ms. Kossoff's). Moreover, drawing from statements in Cerutti v. BASF Corp., 349 F.3d 1035, 1065 (7th Cir. 2003), prior job performance can

12

create a genuine issue of material fact when there are no substantial alterations in the employee's responsibilities.

## DENIAL FOR A RAISE IN 2002

Defendant claims that it was proper to compare Kossoff's salary with that of PARS (Portfolio Administration Manager), rather than managers or directors, for the purposes of determining her eligibility for a raise. The facts in this case clearly contradict this:

1.    Kossoff was not a PAR, but a "Super-PAR", a designation created for her above that of PARS, as she had (Edel at 89, Cherry at 52), and she had numerous substantial additional duties to that of PARS (Edel at 90-91). Her position was "Director of Support Services", not PAR, although she was not compared to other directors (Edel at 92).

2.    The position held by Kossoff at that time was "contracts manager" (Edel at 13, Cherry at 124).

3.    When asked why she was compared with PARS when that was not her designation, Edel's only explanation was "(B)ecause I thought I was doing the upmost to make sure she had a job" (Edel at 118).

4.    Defendant's position is that Kossoff's salary was compared with those of PARS, who were making substantially less that her. If that is so, on would expect her salary would have been diminished to approximate that of a PAR. Defendant admits no comparison was actually done, rather that "possibly" an "anecdotal" look was made, although Defendant could not show either who made this alleged comparison, or with whom Kossoff was actually compared (Cherry at 53, 55). Further, at the time this alleged comparison was made, Kossoff was specifically listed as a "manager" (Cherry at 124).

13

5.    Defendant is incorrect in its assertion that "plaintiff was unable to identify a single GE Capital Manager -- younger or not, disabled or not – employed in a similar role or who would even be an appropriate comparator". Plaintiff specifically listed Wright, a younger, non-disabled employee (Kossoff at 189-190). In addition, it is not appropriate for her to know the salaries of all other managers at GE - she was not in charge of payroll. She knew that she was compared with PARS, rather than Managers, although she was a manager rather than a PAR, and that the PAR position was an entry level position making substantially less than she was (Kossoff at 188-189).

6.    Defendant also claims that Cherry acted "favorably on Mr. Edel's recommendations that plaintiff's salary be increased". This not only mis-characterizes the testimony cited, but flies in the face of Cherry's testimony that Kossoff was not eligible or entitled for a pay increase (Cherry at 53). Documents show that Cherry in fact acted to block a raise for Ms. Kossoff (GE 000219-20 and GE 000207, Exhibit I). Further, Kossoff did not receive the pay raise to which she was entitled.

As such, it is clear that Defendant's proffered reasons for denying Kossoff a raise, that she was overpaid compared with PARs working for them, is untrue. Defendant's repeated lies show that this is nothing more than pretext for their illegal and discriminatory actions, and as such, summary judgment should be denied on the issue of the failure to grant Kossoff a raise in pay. Plaintiff need not disprove each of Defendant's alleged reasons for her disparate treatment. A trier of fact can infer if one or more statements made by Defendant are proved false - the others may be fabricated as well.

## DENIAL OF A BONUS

Defendant claims that the $5,000 received by Ms. Kossoff in 2002 was a VIC (variable

14

incentive bonus) bonus, rather than a stay bonus, and as such, Kossoff was not denied her VIC bonus.  This is in clear opposition to the facts.

1.   It was clearly classified as a stay bonus by Defendant (Cherry at 128-131, Doc. 00012, Exhibit J).

2.   The $5,000 was less than Kossoff should have received for her VIC bonus.  Her bonus the year before was $7,000 (Kossoff at 109-110), and Kossoff's replacement (Wright), received a VIC bonus of $14,000 in 2002 (Wright at 43).

3.   The period for which this bonus was intended was 2001 (Kossoff at 111).  Whether she was intended for layoff or not by Defendant is immaterial, as she worked through 2001.  Further, Kossoff testified that in 2001, she was not told that her position was in jeopardy (Kossoff at 214-215).

4.   Kossoff clearly testified that the $5,000 in question "was for helping out with the portfolio rather than going to St. Louis" (Kossoff at 110), rather than for her work the prior year.

5.   Defendant's human resource policies state that terminated employees are to be given their VIC bonuses when those checks are processed for all employees - not earlier (Cherry at 148).

6.   VIC bonuses are to be approved by a higher level than stay bonuses.  Specifically, Jennifer Cherry had the authority to approved stay bonuses, but not VIC bonuses.  She testified that she alone approved Kossoff's stay bonus (Cherry at 149).

Defendant does not claim that Kossoff was not entitled to a VIC bonus - rather - that she was, and that the $5,000 received constituted it.  Her replacement, a non age-protected, non-disabled employee, received what specifically was termed a VIC bonus, which was almost three times Kossoff's stay bonus.  Defendant's actions clearly show that its proffered reason for denying Kossoff

15

this earned bonus - that she did receive it, is pretext for its illegal and discriminatory actions, and as such, its motion for summary judgment on this issue should be denied.

## KOSSOFF'S TERMINATION WAS DISCRIMINATORY

Under the McDonnell-Douglass framework a plaintiff must support an inference of pretext. Pretext is provided by showing that the employer's proffered explanation is unworthy of credence and, as a result, provides an inference of discrimination Schmidt v. St. Regis Paper Co., 811 F.2d 131 (2d Cir, 1987).

Defendant apparently is claiming that the entire decision to terminate Kossoff was made by Bill Duffek. This is untrue. Numerous facts show that prior to that, Defendant took steps, in bad faith, setting up Kossoff to be terminated. When Kossoff was demoted from Contracts Manager, she was not told that the position was to be a temporary one (Cherry at 143), or that her job was in jeopardy, although it is clear that Defendant intended the position to be temporary when it was created (Cherry at 144, Exhibit E - GE00052, wherein under Plaintiff's name the words "two years" is bulleted). Although Defendant's policy was that its human resources department was to give Phoenixcor terminated employees information about open positions in the packages prepared for them, Defendant specifically did not do that for Ms. Kossoff (Cherry at 147), and denied that it had done that for any (Cherry at 146). However, Defendant's documents refute this (GE000115 - Exhibit K), and Plaintiff's exhibit makes it clear the these individuals are both substantially younger than Kossoff, and not disabled (Exhibit L).

When Kossoff was demoted from Contracts Manager, one of the provisions of her new position was that she would be able to work from home one day a week to accommodate her physical disabilities (Kossoff at 81, Cherry at 35). She was given a computer by Defendant, as much of the

16

home work would be done on computer (Kossoff at 89-90). This was continued allegedly because Cherry "did not have a way to know if Plaintiff was working while at home" (Kossoff at 183-184). Cherry testified, however, that she communicated with Kossoff when she was at home both by phone and email, that she never complained to anyone about being unable to determine if Kossoff was working while at home (Cherry at 42), and that neither she nor any other person had any problems communicating with Kossoff while she was working from home (Cherry at 38-39). Further, Defendant was able remotely to monitor Kossoff's home computer use (Cherry at 40).

The evidence shows that from the time Kossoff was demoted from Contracts Manager, Defendant intended to terminate her within a two-year period. This was at the same time it brought in a non-disabled, non age-protected individual, who was not more qualified (Wright), to replace Kossoff in the position she was working. Defendant's alleged non-discriminatory reasons are nothing but pretext for its illegal actions, and as such, its motion for summary judgment with regard to Kossoff's termination should be denied.

## C. DEFENDANT HAS BREACHED THE COVENANT OF GOOD FAITH AND FAIR DEALING

Defendant had an obligation to act fairly according to its policies, and certainly to speak the truth in dealing with the court and administrative agencies handling this matter. Defendant attempted to prevent the Commission on Human Rights and Opportunities (CHRO) from conducting its investigation of Kossoff's discrimination complaint on the basis that the Resolve process had not been undertaken (Exhibit M). Further, it contends "it was plaintiff's burden to initiate the process" (Defendant's Motion for Summary Judgment at 25).

Jennifer Cherry, the head of Human Resources at the time Kossoff was employed (Cherry at 6) could not state that the program was mandatory for Kossoff, as she was working for Defendant

17

at the time the plan was instituted (Cherry at 13).  Plaintiff contends that said plan was not

mandatory (Amended Complaint at 68).   Even assuming that Kossoff had proper notice that such

a plan existed (which Plaintiff contests), she was under no obligation to pursue the process prior to

filing a complaint with the CHRO, and then to claim to this court that it is her requirement to use this

process, rather than pursue the remedies available pursuant to state and federal law, shows its

dishonest purpose.  This in itself proves Defendant's bad faith.

It is well-settled law in Connecticut that a unilateral change by an employer in the terms and

conditions of employment which negatively affects the rights of an employee is of no effect absent

consideration.  See e.g. <u>Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.</u>, 234 Conn 1, 18

(Conn. Super), <u>Gibbs v. Connecticut General Life Insurance Co.</u> *et al*, 21 Conn L. Rptr. 15, 533,

May 25, 1998.  According to the 2nd Restatement Contracts Sec. 205, Comment d *"Good faith*

*performance.*  Subterfuges and evasions violate the obligation of good faith in performance even

though the actor believes his conduct to be justified.  But the obligation goes further: bad faith may

be overt or may consist of inaction, and fair dealing may require more than honesty.  A complete

catalogue of types of bad faith is impossible, but the following types are among those which have

been recognized in judicial decisions: imperfect performance, abuse of a power to specify terms, and

interference with or failure to cooperate in the other party's performance.

## D. THE CLAIMS FOR NEGLIGENT MISREPRESENTATION AND FRAUD ARE SUBSTANTIATED BY THE EVIDENCE

Defendant once again misrepresents the facts in an attempt to stop Kossoff's claim for

negligent misrepresentation and fraud.  Intent is not necessary to prove negligent

misrepresentation D'Ulisse-Cupo v. Board of Directors, 202 Conn. 206, 520 A.2d 217 (1987).

18

## CONTRACTS MANAGER POSITION

While the written job requirement stated that a paralegal certification was required, the evidence shows that this was not true, and was put in to prevent Kossoff from seeking and getting the position. This is discussed in detail on page four of this memorandum, under the "Contracts Manager Position" for Ms. Kossoff's claim, which show that a paralegal certification was not necessary to perform the position, that Kossoff was in fact qualified to perform the position, and that Kossoff did not apply for the position because Edel, her supervisor and the hiring manager, told her she was not qualified for the position because she was not a paralegal.

The fact that a documents states a paralegal certification was a necessary prerequisite, when the facts show otherwise, show the misrepresentation of Defendant. The only issue is factual - the level of intent of the statements. A finding of negligence would prove negligent misrepresentation, and intentional would prove fraud. As such, its motion for summary judgment with regard to this cause of action should be denied.

## TELECOMMUTING

Again, Defendant attempts to dispute the evidence in its attempt to attack this claim. Kossoff did not say the nature of the Contracts Manager position prohibited telecommuting - she testified that she was told by Edel that the nature of the position would require her coming into the office (Kossoff at 184). As such, the "present intention" standard offered by Defendant has been satisfied. Moreover, since according to Defendant's own documents, it appears not to have intended Ms. Kossoff's position to be permanent (Cherry at 144, Exhibit E, wherein under Kossoff's name is a bulleted statement of "2 years"). Further, Kossoff never stated she voluntarily gave up telecommuting. She testified she was *permitted* to telecommute only until

19

she took over Wright's duties (Kossoff at 189).

In addition, Defendant does not mention that at the time she was demoted from Contracts Manager, her new position was intended to be temporary, although it was presented to her as permanent. It also ignores the fact that the reason given to Kossoff for terminating her telecommute was that Cherry allegedly was unable to determine whether she was working while at home. Both of these issues are discussed in detail under "Kossoff's Termination was Discriminatory" starting on page nine of this memorandum.

Interestingly, Defendant, for the purposes of this motion, has changed its position on the reason for discontinuing Kossoff's telecommute. Throughout discovery, the reason given was that Defendant could not determine whether Kossoff was working at home. Now, in its motion, it states that because she would be acting as Contracts Manager, the job requirements prevented any telecommuting (Defendant's motion at 28). Defendant is not only factually inaccurate in its motion, it can't keep its inaccurate statements consistent. This is further proof of the misrepresentation. Again, the only issue is factual - the level of intent of the statements. A finding of negligence would prove negligent misrepresentation, and intentional would prove fraud. As such, its motion for summary judgment with regard to this cause of action should be denied.

## COMPENSATION DENIALS

As Ms. Kossoff testified, she was told by Edel that when she was demoted from the position of Contracts Manager, it would not affect her compensation and benefits would not be affected (Kossoff at 180, 182). She also testified that she was told that she would get a raise in September of 2001 (Kossoff at 182). She did not receive the raise. She was classified as a

20

Director and a Manager, yet Defendant "possibly" made an "anecdotal" comparison with PARS, an entry level position, which Defendant admits was not her position, and she was not doing the same duties. This is detailed above in the "Denial of a Raise" section, starting on page 13. It is not, as Defendant claims in its motion "undisputed that Mr. Edel recommended to the human resources department that Plaintiff would receive a raise in 2002" (Defendant's motion for summary judgment, page 30). That is Defendant's allegation - tempered with the fact that Edel testified that he had told Kossoff at that time that she was to be terminated (Edel at 87) that it was only because she was "overpaid"- part of Defendant's attempt at justification for not giving Kossoff the raise. This is at best for Defendant an issue of fact for trial, with Defendant's position illogical. A finding of negligence would prove negligent misrepresentation, and intentional would prove fraud. As such, its motion for summary judgment with regard to this cause of action should be denied.

As detailed in the above section entitled "Denial of a Bonus", on page 14, Defendant admits that Kossoff was entitled to a VIC bonus for 2001. It claims that the $5,000 paid to Kossoff was a VIC bonus, although the fact clearly show that it was not. As such, Defendant's motion for summary judgment on this issue should be denied.

## THE CUSTOMER SERVICES REPRESENTATIVE POSITION OFFERED TO KOSSOFF WAS A TEMPORARY POSITION

Notably, Defendant does not ask for summary judgment on the issue of whether the position of Customer Services Representative was permanent (Amended Complaint, paragraphs 78, 85). It was presented to Kossoff as a permanent position by Edel (Edel at 88), while the evidence shows that at the time it was presented, it was to be a temporary position (Cherry at 144). Contrary to its own policy, Defendant did not give Kossoff information about open

positions when she was terminated (Cherry at 147). As a result, Kossoff was unable to seek other positions within Defendant or outside the company, and was damaged financially. This claim therefore must be tried.

## E. AGE DISCRIMINATION

Although Defendant states in the first page of the motion that it has moved for summary judgment on the issue of age discrimination, it raised no legal arguments in support, and in fact failed to address it in any substantial way in its memorandum. However, Plaintiff has produced sufficient facts to prove its claim.

The standard for age discrimination pursuant to the Age Discrimination in Employment Act (ADEA) is similar to that of disability discrimination. Plaintiff must prove a prima facie case by showing he/she is over the age of 40, and that he/she suffered an adverse employment action as a result. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000). Plaintiff has shown that she is an age-protected individual, and, as detailed about, was the victim of disparate treatment on the basis of her age. The same inferences of pretext apply here. As such, Defendant's motion for summary judgment on Plaintiff's first cause of action, discrimination based on age, must be denied it its entirety.

## F. DEFENDANT HAS AGAIN FAILED TO FOLLOW THE COURT'S SUPPLEMENTAL ORDER FOR MOTION FILING PROCEDURE

Your Honor has set a Supplemental Order for the procedure for parties filing motions in this matter. Before filing any motion, counsel are required to consult opposing counsel "to try to reach agreement as to the subject of the proposed motion" (paragraph 2). The Order states "(A)ny motion or filing not in compliance with this Order shall not be accepted for filing" (paragraph 8).

22

At no time prior to the filing of this motion did counsel for Defendant contact our office to discuss any issues raised in its motion for summary judgment. As such, Defendant has not followed the Court's Order. Notably absent from counsel's Certification of Compliance is any mention of this requirement. Moreover, the court should question Duffek's affidavit, dated both on March 1, 2004 and March 27, 2004 (apparently post-dated).

This is not the first time Defendant has ignored the Court's Order. Previously, motions were filed not in accordance with the Court Order. Plaintiff has following the Order throughout the pendency of this litigation, with the exception of one sur-reply, which was corrected. Plaintiff leaves it to the Court's discretion.

In summary, Defendant has not reached the burden necessary for summary judgment on any of the causes of action asserted by Plaintiff. As such, Plaintiff respectfully requests that this motion be denied, with prejudice, in its entirety.

Respectfully submitted,
THE PLAINTIFF, JOAN KOSSOFF

By:

MICHAEL PAES, ESQ. - Bar No. CT 19303
Paes & Paes, LLC
4 Washington Avenue
Sandy Hook, CT 06482
203-270-6441

CERTIFICATION - This is to certify that a copy of this Memorandum in Opposition, with all exhibits, was sent, via first class mail, postage prepaid, on this date, to all counsel of record.

MICHAEL PAES

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
JOAN KOSSOFF,

                          Civ. Action No. 3:03CV00203(PCD)
          Plaintiff,

   v.

GENERAL ELECTRIC CAPITAL CORPORATION,    DATE: March 22, 2004

                     Defendant.

## AFFIDAVIT OF MICHAEL PAES

STATE OF CONNECTICUT    )
COUNTY OF FAIRFIELD      )    ss.:

MICHAEL PAES, being duly sworn, hereby deposes and says:

1. I am a partner with the firm of Paes & Paes, LLC in Sandy Hook, Connecticut, the attorney for Plaintiff in this matter. I am over the age of eighteen (18), understand the nature of an oath, and am admitted to practice before this Court. This affidavit is submitted in support of Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, and will serve to authenticate the written discovery and deposition excerpts referenced in said Memorandum.

2. Exhibit N contains a true and correct copy of excerpts from the deposition of Joan Kossoff, conducted 8/7/03.

3. Exhibit O contains a true and correct copy of excerpts from the deposition of John Edel, conducted 1/20/04.

4. Exhibit P contains a true and correct copy of excerpts from the deposition of Jennifer Cherry, conducted 1/27/04.

5. Exhibit Q contains a true and correct copy of excerpts from the deposition of Christine Wright, conducted 1/30/04.

24

6. Exhibits A, E, F, G, I, and K contain documents from Defendant's written disclosure and responses to Requests for Production of Documents.

7. Exhibits B, J and M contain documents from Plaintiff's written disclosure and responses to Requests for Production of Documents.

8. Exhibits C, D, H contain documents submitted by Defendant in response to Plaintiff's complaint filed in regard to this matter with the Connecticut Commission on Human Rights and Opportunities.

_____

MICHAEL PAES

Sworn to before me this 22nd day of March, 2004.

_____

FERN PAES - Commission of CT Superior Court

25

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOAN KOSSOFF,

               Plaintiff,
                             Civ. Action No. 3:03CV00203(PCD)

      v.

GENERAL ELECTRIC CAPITAL CORPORATION,     DATE 3/22/04

               Defendant.

## PLAINTIFF'S LRCP 56(a) STATEMENT

Pursuant to LRCP 56(a), and in opposition to Defendant's Motion for Summary Judgment in the above matter, Plaintiff hereby responds to Defendant's Statement:

1.      Admitted, except that her position was also termed Manager of Contracts (Edel at 17).

2.      Admitted, except that Defendant laid off several of the employees under Kossoff's supervision (Kossoff at 70-73).

3.      Denied that these were the limit of Plaintiff's physical limitations (Kossoff at 97-102).

4.      Admitted, except that Defendant also laid off several employees reporting to Plaintiff at that time, and at least one left because she felt she would be laid off soon after (Kossoff at 72-73).  In addition, Plaintiff's supervisor was laid off (Exhibit A).

5.      Admitted that a portion of the Phoenixcor loan portfolio was merged in Defendant's CAF business. Denied that "a substantial component" of said portfolio was in fact merged (Cherry at 58-59, 68-69). Denied that Defendant's citations show that the terminations of Martin and Kofton were terminated as a result of this merge.

6.      Denied (Edel at 17-20), as the position of Director/Manager or Contracts was not eliminated.   In fact, Kossoff was assigned to train Vickie Holmes-Sells (Exhibit E).

7.      Denied (Edel at 17-20), as the position of Director/Manager or Contracts was not

eliminated. Denied that Kossoff was not a manager (Edel at 92-93, Exhibit G). Denied

that her salary was maintained in full, because when she was eligible for a raise in 2001,

it was denied (Kossoff at 186).

8.  Admitted that Plaintiff received a merit increase in 2000. The statement regarding the

    Variable Incentive Compensation (VIC) bonus is denied, as that bonus was for the year

    1999, and was earned while Plaintiff was working for Phoenixcor, Defendant's

    predecessor in interest (Kossoff at 68). The conclusory statement that the bonus was

    "satisfactory" to Plaintiff, as her opinion was based upon the fact that Defendant told her

    that was all she was entitled to receive (Kossoff at 109).

9.  Denied that Defendant's citations show that Kolb "resigned". Admitted that he did

    resign.

10. Admitted.

11. Admitted.

12. Denied (Edel at 20-26, 52-59, 103).

13. Admitted, except that Edel told Kossoff that she was not qualified for the position, and

    that it was a "done deal" (Kossoff at 114, 216, Edel at 112 and 113).

14. Admitted that at the time the job search was conducted by Defendant, Plaintiff did not

    have a paralegal certification. Denied that she had not conducted negotiation of legal

    documents (Edel at 105).

15. Admitted that Wright was hired as Contracts Manager. Admitted Wright has a Bachelor

    of Arts degree in legal studies. Denied that through her prior employment, Wright gained

    familiarity with documents similar to those of GE Capital - they were in large part limited

2

to proofreading form documents to be filled out with the same words as copies of those documents (Wright at 14-15).

16.    Denied (Edel at 20-25, 103, Exhibit B, Kossoff at 226-227).

17.    Plaintiff denies the first sentence, as portions of the Phoenixcor portfolio were handled at different locations (Kossoff at 120). Plaintiff neither admits nor denies that the Small Business Finance unit maintains centralized support capabilities in St. Louis because of defects in Duffek's affidavit, which is post-dated.

18.    Plaintiff neither admits nor denies. There is nothing in the citation from Cherry's deposition that she spoke with Duffek. Duffek's affidavit is post-dated and therefore defective. Moreover, Exhibit E at bullet ("2 years") indicates that Ms. Kossoff was intended to terminated prior to Cherry's alleged discussion.

19.    Plaintiff neither admits nor denies - see #17 and 18.

20.    Admitted.

21.    Denied. The telecommute was not discontinued voluntarily by Plaintiff - rather she was told she no longer could do so by Edel (Cherry at 42, Kossoff at 183-184). Defendant also has alleged a reason for its discontinuance of the telecommute that Plaintiff had to be in the office all five days while performing Wright's duties (Kossoff at 184, 189). Admitted as to the second sentence.

22.    Denied. The citations show not that Kossoff told Edel that she was not interested in a transfer, but rather, if she had to transfer, she would have to move (Kossoff at 157).

23.    Admitted, but plaintiff never received her VIC bonus to which she was entitled.

24.    Admitted that Plaintiff received a stay bonus but denied that she received her VIC bonus

3

to which she was also entitled.

25.    Admitted as to the first statement. The fact that Plaintiff did not receive any different

objectives for the year 2001 when the objective for the prior year were in place goes to

the issue of the fact that Defendant had planned from the outset to terminate Plaintiff

(Exhibit E).

26.    Plaintiff admits that the payment in question was termed a "stay bonus", but denies the

reason alleged for the payment by Defendant (Kossoff at 110).

27.    Admitted.

28.    Admitted that Defendant stated this reason, but neither admits nor denies this, because the

reason was given after the fact, but denies that Plaintiff was told this ever by Defendant

(Exhibit D at #24).

29.    Admitted, but Plaintiff was not a PAR (Exhibit G).

30.    Neither admitted nor denied (Kossoff at 212). Defendant provided only the email and not

the attachment during discovery.

31.    Admitted, but at the same time Plaintiff sought to settle the dispute amicably through her

attorney (Exhibit R).

Plaintiff denies Defendant's claim that there are no genuine issue of fact, and ask that its motion

be denied in its entirety.

Pursuant to LRCP 56(a)2, Plaintiff submits that the following are genuine issues of fact to be

tried in the above-referenced case:

1.    Ms. Kossoff is disabled pursuant to 42 USCA 12102 *et seq*. (Kossoff at 97-104).

2.    Ms. Kossoff was perceived as disabled by Defendant (Edel at 71, Kossoff at 88-92, 96-

4

97, 100).

3.    Ms. Kossoff was qualified to perform the duties of Manager of Contracts as defined by

       Defendant in 2000 (Edel at 20, 26, Kossoff at 124-125, 226-227, Wright at 66-67.

4.    Paralegal certification and experience were not required prerequisites for the position of

       Manager of Contracts as defined by Defendant in 2000 (Edel at 20, 57, Kossoff at 226-

       227, Wright at 66-67).

5.    Direct negotiating with clients was not a stated requirement  for the position of Manager

       of Contracts as defined by Defendant in 2000 (Edel at 103).

6.    The position of Director of Contracts held by Ms. Kossoff was essentially the same as the

       position of Manager of Contracts held by Wright and Kossoff (Edel at 20, Kossoff at 226-

       227).

7.    While Wright was on maternity leave, Kossoff performed her duties (Edel at 9-10,

       (Wright at 66-67, Kossoff at 124-125, 131-136), without any complaints as to her

       performance (Kossoff at 217, Edel at 60).

8.    Wright told Ms. Kossoff the position would be "a piece of cake" (Kossoff at 121, Wright

       at 67).

9.    No paralegals or attorneys were brought in to assist Kossoff (Edel at 60).

10.   Ms. Kossoff did not apply for the position of Manager of Contracts because Edel told her

       that the position was changing, and that paralegal experience was a necessary prerequisite

       for the position, and therefore, Kossoff was not qualified (Kossoff at 216, Edel at 112 and

       113).

11.   The refusal to make Ms. Kossoff Manager of Contracts by Defendant was based, at least

5

in part, on her physical disability and/or her perceived disability and/or age (Kossoff at 216).

12. The position of Customer Service Representative/Director of Support Services was a demotion for Ms. Kossoff in that she eventually had no direct reports.

13. At the time this position was offered to Plaintiff, Defendant intended it only to be a temporary position, and that Ms. Kossoff would be terminated (Cherry at 144).

14. The position was presented to Ms. Kossoff as a permanent position by Edel (Edel at 88).

15. From at least June of 2001, Defendant knew Ms. Kossoff would be terminated (Edel 86-87).

16. This representation as to permanency of the position was made in order to induce Ms. Kossoff to accept the position (Kossoff at 196).

17. Cherry contended she could not know if Ms. Kossoff was working at home while she was telecommuting (Kossoff at 183-184, Cherry at 44, Edel at 44).

18. Cherry in fact had actual notice that Kossoff was working from home, and Defendant had the capacity to monitor her computer use (Cherry at 39-42).

19. Ms. Kossoff provided the majority of Wright's training for the position of Manager of Contracts, which took three months (Kossoff at 115-117, Wright at 55, Exhibit D at 12).

20. In its decision to deny Ms. Kossoff at raise in 2001, Defendant compared Kossoff's salary with that of PARS (Portfolio Administration Manager), although no specific comparison was actually done (Cherry at 53, 55).

21. Ms. Kossoff was not a PAR, and was not performing the duties of a PAR, in that she had numerous substantial additional duties to that of PARS (Edel at 90-91, Exhibit G).

6

22.   Contrary to its own policy regarding affected Phoenixcor employees, Defendant did not give Ms. Kossoff information about open positions when she was terminated (Cherry at 147).

23.   Defendant repeated evaded Kossoff's queries regarding her raise (Kossoff at 181).

24.   Ms. Kossoff was told by Defendant that her position was not in jeopardy, and that work regarding the Phoenixcor accounts would remain in Norwalk, Connecticut (Kossoff at 49).

25.   Defendant knew or should have reasonably known this (#24) was false, and did not take due care in communicating to Kossoff (Kossoff at 49, Defendant's CHRO Schedule A answers #11a, exhibit H, and Edel at 86).

26.   Edel did not believe Ms. Kossoff was entitled to a raise in 2001(Edel at 13-15).

27.   Cherry did not believe Ms. Kossoff was entitled to a raise in 2001 (Cherry at 51).

28.   Cherry actively opposed Ms. Kossoff's requests for a raise in 2001 (Exhibit I).

29.   Ms. Kossoff was not paid a VIC bonus in 2002 for work done in 2001, although entitled to one (Kossoff at 109-110, Cherry at 128).

30.   In or about February of 2002, Ms. Kossoff requested a copy of her personnel records, but no records were produced until after she had made a second request in April of that year (Kossoff at 191-192).

31.   These personnel records included medical information on Ms. Kossoff (Kossoff at 154-155, 192-193).

32.   Defendant did not keep medical records in a separate locked file apart from personnel

7

records (Cherry at 26-29).

33.   Defendant does not keep all personnel reviews in its personnel files of those employees
      (Cherry at 23).

34.   It was not mandatory for Ms. Kossoff to use the Resolve program with Defendant prior to
      filing a claim with CHRO or otherwise (Cherry at 13).

35.   Defendant invoked the Resolve program in bad faith with regard to Ms. Kossoff, and
      claimed that it was mandatory for her to use it (Cherry at 13, Exhibit M).

36.   Kossoff is over the age of 40 (Kossoff at 97-100).

37.   Ms. Kossoff was Director of Contracts for Phoenixcor at the time of Defendant's said
      acquisition.  She managed the contracts department for all three of Phoenixcor's lines of
      business, i.e. direct lending, biotech, and third-party broker lending (Kossoff deposition at
      64-66, 79-80).

38.   As a result of Defendant's acquisition, it laid off a substantial number of employees, and
      additional employees left voluntarily (GE 00097-000111 - Exhibit A).

39.   According to Defendant, Al Kolb, an in-house attorney, who was responsible for
      "providing legal review of Phoenixcor's deal documentation", resigned in the year 2000
      (Kossoff at 83-84, Edel at 18).

40.   At the same time, Defendant "eliminated" Ms. Kossoff's position, and created a position
      of Contracts Manager, and demoted Ms. Kossoff to Support Services Manager or
      Director in April of 2000.

41.   Ms. Kossoff was not given a choice of applying for the Contracts Manager position.

8

Edel, the hiring manager, told her she was not qualified for the job, because she was not a paralegal (Edel at 112 and 113).

42.    Kossoff trained Wright for the position of Manager of Contracts over a three-month period (Kossoff at 115).

43.    In contrast to Wright's training, Ms. Kossoff needed only about an hour or two of training in order to assume all her duties (Wright at 67).

44.    Kossoff supervised Wright's employees (Kossoff at 123), when she filled in for Wright (Wright at 64, 66, 68).

45.    Kossoff negotiated contracts (Kossoff at 124) and rarely had to ask counsel for advice (Kossoff at 124) when she substituted for Wright - in contrast, when Wright first started, she went to the general counsel most, if not all of the time (Wright at 59).

46.    When Ms. Kossoff was shifted to her Director/Manager of Support Services job she was told that she would be able to telecommute one day per week in that position in order to entice and induce her to accept that position (Kossoff at 81).

47.    Edel (at 45) and Cherry (at 38-39) both testified that neither of them had any problem communicating with Kossoff when she was working from home, nor had any other employee made any such complaint.

48.    Ms. Kossoff was in the middle of the salary spread for contract managers, with one at $77,009, Ms. Kossoff at $81,293 and a third at $84,165 (GE 000204 - Exhibit G).

49.    Defendant repeatedly evaded Kossoff's questions regarding her job and such evasion was negligent and/or intended to mislead her (Kossoff at 49, Defendant's CHRO Schedule A

9

answers #11a, exhibit H, and Edel at 86).

50.     Ms. Kossoff did not aggressively seek employment until she was told she was to be

terminated in reliance on Defendant's statements Kossoff at 44-46).

WHEREFORE, Plaintiff respectfully requests that Defendant's motion be denied in its

entirety, together with such other and further relief as to this Court may deem just and proper.

Respectfully submitted,

PAES & PAES, LLC
Attorney for Plaintiff
4 Washington Avenue
Sandy Hook, CT 06482
203-270-6441

By: _____
MICHAEL T. PAES
Federal Bar No. CT19303

10