# EXHIBIT A

COPY

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------X

JOAN KOSSOFF,

Plaintiff,

-against-

Civil Action No. 3:03CV00203(PCD)

GENERAL ELECTRIC CAPITAL CORPORATION,

Defendant.

---------------------------------------------X

400 Atlantic Street
Stamford, Connecticut
August 7, 2003
10:00 a.m.

EXAMINATION BEFORE TRIAL OF Plaintiff, held at the above time and place, before a Notary Public.

SULLIVAN REPORTING
388 Tarrytown Road
White Plains, New York 10607
(914) 220-6541

b0c68b7f-1de1-459e-85d6-6f1127d006d2

                        Q. Who did you ask?

A. John Edel.

Q. Was this conversation shortly after you reviewed the e-mail?

A. Yes.

Q. So it would have been June 2001?

A. Yes.

Q. Where did you have a conversation with Mr. Edel on this occasion?

A. In his office.

Q. Was anybody else there or just the two of you?

A. Just John and I.

Q. How long did the conversation last?

A. I don't remember.

Q. What do you recall being said during the course of the conversation by you and Mr. Edel?

A. I questioned him on what I had read; and as far as he knew, my position was fine, they were not transferring my duties out there.

b0c68b7f-1de1-459e-85d6-6f1127d006d2

Q. Who were the people reporting to you at the time of the acquisition?

A. You want all the names of the people in the department?

Q. That were reporting to you, if you can remember.

A. As much as I can remember, it was Michelle Martin, Sabrina Walker, Vicky Holmes-Sells, Lorraine Desonto.

Q. Could you give me those last two names again?

A. Vicky Holmes-Sells, Sabrina Walker, Lorraine Desonto, Rosa, I can't recall her last name.

Q. Helorito?

A. Yes. Dewania, D-E-W-A-N-I-A, Lofton, Crissy, I can't recall her last name, Crissy, I don't recall her last name. Crissy, C-R-I-S-S-Y, D'Orio.

Q. Was there a George Edel in your group?

A. Geordie. I guess his formal -- we called him Geordie. He was my file clerk.

b0c68b7f-1de1-459e-85d6-6f1127d006d2

Q. You were reporting to Mr. Winke?

A. Yes.

Q. He was the general counsel of the business?

A. Yes.

Q. Was it Mr. Winke who approved the change in your hours?

A. Yes.

Q. Do you recall anything about your conversation with Mr. Winke where he authorized that change in your hours?

A. He allowed it. I can't say he wrote it down. I also was going for physical therapy. He said take care of it, do what you have to do.

Q. Did you explain to him why you wanted to change your hours in the summer of 1998?

A. I didn't have to explain, everybody knew I had a problem driving.

Q. How did everybody know you had a problem driving?

A. Because I was in a brace and I

Joan Kossoff

A. No.

Q. Aside from what you just described as the numbing sensation when you sat in a car in traffic, what other, if any, consequences were there associated with your sciatica? In what other way did it affect you, if at all?

A. You have pain.

Q. Is that constant?

A. No, it comes and goes.

Q. Did you have medication for that pain?

A. Yes, Vioxx and Celebrex.

Q. You just took that as-needed?

A. Yes.

Q. During the summer of 1998 when you first were diagnosed with sciatica, how often did you take the pain medication?

A. Once in the morning when I got to work. That's all you're allowed to take it.

Q. Did that regimen continue?

A. It depends on the day.

Q. You didn't take it every day?

A. No.

b0c68b7f-1de1-459e-85d6-6f1127d006d2

A. Sure.

Q. Who are they?

A. John Edel, Vicky Holmes-Sells, Sabrina Walker, Tom Williams, who else was there? Let's see. Bob Dion.

Q. Bob who?

A. D-I-O-N.

Q. Anybody else who you believe perceived you as disabled at GE Capital?

A. It's very obvious when you walk around with a brace you're disabled.

Q. Did Mr. Edel ever do or say anything to suggest to you he perceived you as disabled other than what was written in the performance appraisal?

A. Speak to me directly about it.

Q. Anything you're aware of that he suggested to you that he perceived you as disabled?

A. Yes. When I was given the position in support services and he told me that I could work from home, that had a lot to do with the disability. He felt it would be easier on me, less commuting would help.

b0c68b7f-1de1-459e-85d6-6f1127d006d2

A. He didn't put it that way. He said you will no longer be director of contracts, we need X, Y and Z, this is going to be a good position. I knew from what he was saying I didn't have the legal background he was looking for.

Q. In the next paragraph you attribute to Mr. Edel two remarks, one that you would be permitted to telecommute one day a week from your home; and two is that your compensation and benefits would not be affected by the change in your job.

A. Right.

Q. Those are both representations Mr. Edel made to you around the time he told you about the change in your job?

A. Yes.

Q. You were in fact permitted to telecommute one day a week from home, at least until the time you were filling in for Ms. Wright; is that correct?

A. Yes.

Q. Your compensation and benefits in the immediate aftermath of the change were

b0c68b7f-1de1-459e-85d6-6f1127d006d2

not affected; is that right?

A. That's right.

Q. To your knowledge, was your compensation and benefits ever affected by the change in your position to support services manager?

A. Later on I found out it was.

Q. What did you find out?

A. When I asked where my raise was that John had put in for, he didn't answer me, he said he'll look into it. I did also speak with Jennifer directly and I asked her what happened to my raise. She said she would look into it. I finally again asked John and he said that basically I was -- there had been some type of an analysis made of all the customer service people and I was the highest paid and I didn't deserve a raise because I was basically a high paid customer service person according to human resources and I would not be getting a raise.

Q. What was your response to Mr. Edel's disclosure to that representation?

A. I was disappointed and upset.

b0c68b7f-1de1-459e-85d6-6f1127d006d2

Q. Do you know who rejected that proposal that you get a raise?

A. I was told by John Edel through Jennifer Cherry that I was an overpaid high class clerk basically and that's why I wasn't getting a raise.

Q. As far as you know, Ms. Cherry was the one who made the decision not to award you a raise?

A. She made the decision to give out the information, I don't know who made that decision. According to John, the information came from Jennifer.

Q. When did Mr. Edel report to you that Ms. Cherry had said you are not eligible for a raise because of the nature of your position and the salary you were already drawing?

A. I think it came to a head in December. I kept pursuing it.

Q. How many times did you ask Mr. Edel about the raise between September and December?

A. Twice, then I went and I asked

b0c68b7f-1de1-459e-85d6-6f1127d006d2

A. The whole picture points to that.

Q. What else is part of the picture besides your allegation Mr. Edel didn't believe that you could be there every day?

A. I think he would not have offered me working at home if he thought I could be there every day, definitely.

Q. Did anybody ever say or do anything in particular that supports your allegation that you were terminated, not given a raise or not awarded the manager of contracts decision because of a disability or perceived disability?

A. I don't know, I don't know what was discussed behind my back.

Q. Did you ever hear Mr. Edel make a disparaging remark about your physical condition or your back?

A. He wouldn't do that to my face, but I don't know what he said behind my back.

Q. Do you know whether he said anything behind your back?

b0c68b7f-1de1-459e-85d6-6f1127d006d2

Exhibit 1 Exhibit 2 Exhibit 3 Exhibit 4

Joan Kossoff

A. I have no idea.

Q. Did you ever hear a rumor to that effect?

A. No.

Q. Mr. Edel had some health problems of his own, didn't he?

A. Yes.

Q. What was that?

A. He had stomach problems and because of his health problems, he was demoted.

Q. Pardon?

A. He was demoted because of his health problems.

Q. How do you know that?

A. Because his position was given to Tom Annino, who was quite healthy and younger, and when John came back, he was told about his demotion.

Q. He was on leave for some period of time?

A. About a month to six weeks he was out.

Q. Was he out for a surgical procedure?

b0c68b7f-1de1-459e-85d6-6f1127d006d2

Exhibit 1 Exhibit 2 Exhibit 3 Exhibit 4 Exhibit 6 Exhibit 7 Exhibit 8

# EXHIBIT
# B

COPY

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---------------------------------------------X

JOAN KOSSOFF,

Plaintiff,

Vs.

Civil Action No. 3:03CV00203(PCD)

GENERAL ELECTRIC CAPITAL CORPORATION,

Defendant.

---------------------------------------------X

DATE: January 20, 2004
TIME: 10:00 a.m.
PLACE: 4 Washington Avenue
Sandy Hook, Connecticut

**DEPOSITION OF JOHN EDEL,**

a witness on behalf of the Defendant, General Electric Capital Corporation, held pursuant to Notice, before Joanna P. Mastrantuono, Registered Professional Reporter and Notary Public in and for the State of Connecticut.

---------------------------------------------

GREATER DANBURY COURT REPORTERS
100 Mill Plain Road; P.O. Box 354
Danbury, Connecticut 06810
(203) 792-9695/FAX(203) 798-0725

A. No.
Q. On page three, under Career Interests it states "Health and commuting issues could be limiting factors in placing elsewhere." Is that sentence on page three of that document?
A. Yes.
Q. Would you consider that medical in nature?
A. No, I don't think so.
Q. Was this part of your review of Ms. Kossoff?
A. Yes.
Q. Do you consider that appropriate of an employee assessment?
A. I would consider, when I was writing that, that I was doing her a favor.
Q. What do you mean by that?
A. Ms. Kossoff was already aware that we had basically created a job for her in 2000 out of the ordinary for GE. Her probably best advancement was through the business center in Danbury where most of these functions were run from. Ms. Kossoff absolutely did not wish to go to Danbury under any circumstances. When I wrote that sentence, "Well placed for now, health and commuting issues could be limiting

factors in placing elsewhere," I thought I was doing her a favor by making sure that she would not be transferred up to Danbury.

Q. But, again, in your opinion, is this an appropriate statement to go into an employee review?

A. Yes.

Q. Do you think that this is an appropriate statement for a document which is going to be placed in an employee's file?

MR. PEIKES: Objection to the form.

A. Yes.

MR. PAES: Let's take a five-minute break.

(Pause in proceedings.)

MR. PAES: Back on the record.

BY MR. PAES:

Q. Mr. Edel, I believe you had earlier testified that Ms. Kossoff had told you about her sciatica.

A. Yes.

Q. Do you remember when you first learned of this?

A. I knew she was having problems with her leg back

all the way to Phoenixcor.

Q. Can you give me anything more specific? A year? A month?

A. No.

Q. Does GE Capital have any internal employee issue resolution programs, for lack of a better word? Any remediation?

A. Yes, they do.

Q. What are they?

A. I couldn't tell you specifically; I've never used them.

Q. Are you aware of a plan called Resolve?

A. Yes.

Q. How were you made away aware of this?

A. E-mails.

Q. Have you ever seen any documents about it?

A. I believe we received documents about it, yes.

Q. What documents did you receive?

A. A pamphlet or a booklet, something of that sort.

Q. You don't remember specifically communications?

A. No.

Q. Do you remember when you received these e-mails?

A. No.

Q. Was it before or after Ms. Kossoff was working

someone to assume any of her duties was discussed?

A. With respect to what job?

Q. Going from manager of contracts to customer service rep?

A. Yes. I think I testified that there was a meeting.

Q. Do you remember the substance of what the conversation was?

A. I believe the substance of the conversation was whether we were going to hire another lawyer, which, given the then volume was not really an economic option, or whether we were going to hire a new manager of contracts.

Q. Now, you said that your position at GE had changed, that your duties, I guess you said, Mr. Annino now was performing your duties?

A. Mr. Annino, yes, from, I would say, mid 2001 onward.

Q. What were the circumstances surrounding that?

A. Sometime in February or March of 2001 I was approached by the head of Capital Funding, which is a unit within GE. They had taken over the Life Science business. They wanted to know if I

was interested in taking over as general manager of that business; I said yes. I was given to understand that I would still have to perform some duties over the existing portfolio that GE had inherited from Phoenixcor. Shortly after that I had emergency surgery at the beginning of May or the end of April, and I came back at the end of June. I was told that Mr. Annino had come to his direct supervisor and told him he was going to leave, and he was offered my job instead.

Q. What was that first surgery for?

A. Basically I had 80 percent of my large intestine removed.

Q. Were you removed from your position as general manager while you were in the hospital?

A. I think that promises were made to Mr. Annino while I was in the hospital. Yes. I was not told that this was happening until I returned at the end of June, and it was not formally announced until I returned from my second operation in October.

Q. Out of curiosity, how old is Mr. Annino?

A. Forties.

Q. And how old are you?
A. Sixty-six.
Q. Does Mr. Annino have any physical disabilities, problems, which you are aware?
A. He's got some removal of some cancer growths, I think, some basal cells. Aside from that, I'm not aware of any.
Q. Where was that on his body?
A. Face, head.
Q. Do you believe Ms. Kossoff ever missed any time from work because of her back?
A. No.

(Lunch break was taken.)

MR. PAES: Back on the record.

EXAMINATION BY Ms. PAES:

Q. Mr. Edel, you had talked about Mr. Annino taking your job while you were out and ill. Is Mr. Annino still there?
A. No.
Q. Who's assumed his duties?
A. A gentleman named Anthony Storino.
Q. Does he report to you?
A. No.
Q. Did you ever get your general manager's job?

A. No.
Q. Did you consider that a demotion?
A. Yes, I suppose.
Q. Did Ms. Wright ever get a VIC bonus?
A. Yes, I believe so.
Q. Do you remember what percent it was of her compensation?
A. No, I don't.
Q. Do you remember whether it was higher or lower than Ms. Kossoff's?
MR. PEIKES: Objection to the form.
Q. You can answer.
A. I don't remember what Ms. Kossoff's bonus was and I don't remember what the VIC was.
Q. Do you remember what Ms. Wright's compensation was?
A. She started somewhere around 75 thousand dollars I believe.
Q. Did you put in a recommendation for a raise for her at any time?
A. I'm trying to think whether I would ever have had an opportunity to do that, and I can't remember. If she was still under my

JOHN EDEL

she was qualified for this job. I wasn't speaking for GE.

Q. But of course this job was posted by you; is that correct?

A. That's correct.

Q. And you were going to be interviewing her; correct?

A. Correct.

Q. So the hiring manager felt that the person that would have applied for it wasn't qualified for it; correct?

A. Correct.

MR. PEIKES: Objection to the form.

Q. You can answer.

A. I would consider myself a pretty open person. If she felt she was qualified for this job and made an argument, a strong argument as to why she was, I would have listened. She hadn't posted for the job.

Q. That would have been after you told her personally that you felt she wasn't qualified for the job; correct?

A. Yes.