# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Joan KOSSOFF, | : | |
| Plaintiff | : | Civil No. 3:03cv203 (PCD) |
| | : | |
| vs. | : | |
| | : | |
| GENERAL ELECTRIC CAPITAL CORP., | : | |
| Defendant | : | |

## RULING ON MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Defendant moves for summary judgment[1] on all counts on

Plaintiff's Complaint.  For the reasons stated herein, Defendant's Motion [Doc. No. 40] is

**granted**.

## I.     BACKGROUND:[2]

Plaintiff Joan Kossoff is a 62 year old female.  Plaintiff has been diagnosed with sciatica,

which has caused her pain and discomfort when sitting or standing for long periods of time.  She

brings this action alleging, in her Amended Complaint, statutory violations of the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, et seq, (Count One); and the

Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq (Count Two); as well as

common law causes of action Breach of the Covenant of Good Faith (Count Three); Negligent

---

[1]     Plaintiff notes that Defendant has failed to fully comply with this Court's motion filing procedure by failing to contact Plaintiff's counsel to discuss the issues raised in its Motion prior to filing it. Pl. Mem. Opp. Summ. J. at 23.  Defendant's counsel does not deny this failure, but rather argues that it would have been futile.  Def. Reply Br. at 10.  Futile or not, counsel should make it a habit of complying with Court orders now and in the future.

[2]     The facts that follow are taken from Defendant's Local Rule 56(a) statement and Plaintiff's Local Rule 56(a)(2) statement.  See D. Conn. L. R. Civ. P. 56(a).  Unless otherwise noted, all facts discussed are undisputed.

Misrepresentation (Count Four); and Fraud (Count Five).

Defendant General Electric Capital ("GE Capital") acquired Phoenixcor, Inc. ("Phoenixcor") in April of 1999. Plaintiff, having been employed by Phoenixcor, became an employee of Defendant as a result of this transaction, retaining her title as Director of Contracts with no downward adjustment in her base salary. However, as part of that acquisition a number of employees left voluntarily or were laid off.

In early 2000, Defendant merged a component of the former Phoenixcor loan portfolio into its Commercial Asset Funding business ("CAF"). As a consequence, two individuals reporting to Plaintiff were laid off and Plaintiff no longer had anyone reporting directly to her. Shortly after these changes, Defendant eliminated Plaintiff's Director of Contracts position and assigned her to the position of Support Services Manager. Plaintiff characterizes this not as a position elimination, but as a demotion. In this capacity she provided customer support for the former Phoenixcor portfolio of loans that were serviced out of Norwalk, CT. In her new position, Plaintiff had no one directly reporting to her. Plaintiff's base salary was not lowered in the Support Services Manager Position and she was given a merit based raise in September 2000 as well as a Variable Incentive Compensation ("VIC") bonus for the year 2000.

Plaintiff contends that Defendant always knew this position to be a temporary one and that she was misled into believing it permanent. Defendant denies this allegation.

As part of the terms of her employment in the Support Services Manager position, Plaintiff was told she would be able to telecommute one day a week. Plaintiff did so for approximately one year before the practice ended for reasons addressed below.

In April 2000, Al Kolb, an in house attorney who came to GE Capital as part of the

2

Phoenixcor acquisition, resigned and Defendant decided not to hire a lawyer to replace Kolb.[3]

Instead, in or around June 2000, Defendant posted an opening for Contract Manager, or

Contracts Administration Manager, stating that prior paralegal experience or a paralegal degree

was a required qualification as the position involved negotiating loan and lease agreements

directly with customers or their legal representatives.  Plaintiff expressed interest in the position,

but states that she was told she was not qualified.  Plaintiff does not have a paralegal degree or

paralegal experience, but claims experience in negotiating contracts.  Plaintiff contends that the

position was substantially similar to her former position and that she was capable of performing

the duties required.  Defendant only interviewed individuals with paralegal degrees or experience

and ultimately hired Christine Wright, a younger individual, with a bachelor of arts in legal

studies and thirteen years experience working as a paralegal prior to joining GE Capital.  Plaintiff

contends, however, that the positions were the same and that she successfully trained Wright for

the position over a period of three months and performed her duties while Wright was on

maternity leave from in or about September 2001 through the end of the year.  Plaintiff does

note, however, that she did not have to closely supervise Wright's employees during that time.

It was during Plaintiff's time filling in for Wright that she ceased telecommuting.  It is

undisputed that she could not telecommute while acting in this capacity.  Nevertheless, Plaintiff

also maintains that she was otherwise forced to stop because Defendant raised questions about

whether she was really working from home.  As far as Plaintiff is concerned, these questions

were baseless.

---

[3]    Plaintiff seeks to cast doubt on Defendant's factual account of Kolb's resignation, Pl. Mem. Opp.
Summ. J. at 2, but provides no evidence to suggest any other account is more appropriate.

In early 2001, Defendant merged the CAF business unit into the Small Business Finance unit, headquartered in St. Louis, Missouri. In connection with this merger, Jennifer Cherry of GE Capital's Human Resources department, asked William Duffek, Senior Vice President and Risk Manager for the Small Business Finance unit whether he wished to maintain customer support resources in Norwalk and he declined. Mr. Duffek had never worked with or met Plaintiff and states that he was unaware of Plaintiff's age or medical condition.

In or around August 2001, Plaintiff's customer support duties were transferred to existing GE Capital employees in St. Louis. Plaintiff claims that in June 2001, she approached John Edel and asked whether this transfer (anticipated at the time) would affect her position. She maintains that she was told it would not. Again, in approximately August of 2001 when Plaintiff was asked to pack up the files and send them to St. Louis, she inquired about the status of her job and was told it was secure.

Nevertheless, after having filled in for Wright while she was on maternity leave (commencing in approximately September 2001), Plaintiff was terminated in February 2002. Around this time, Plaintiff received at $5,000 bonus which Defendant contends was a VIC bonus disguised as a stay bonus for the sake of expediting the dispersal of the funds. Plaintiff, however, claims that this was not a VIC bonus and that she never received a VIC bonus, to which she was entitled.

Prior to her termination, in or about September 2001, Plaintiff asked John Edel about her annual raise. Defendant contends that Edel requested a raise for Plaintiff, but that it was denied by Cherry. Defendant's stated reason for denying the raise was that Plaintiff's salary was already double the average salary of GE Capital's Danbury based Portfolio Administration

Representatives ("PARS"). Plaintiff argues that she should not have been compared to PARS and that she was more appropriately compared to other contract managers and that in this context her salary was not above average and a raise was proper.

Defendant claims that in or about May 2000, GE Capital issued an email to its employees regarding a new employee dispute resolution program called RESOLVE. Defendant states that an electronic version of the handbook was attached to the email and that Plaintiff received it. Plaintiff denies knowledge or notice of the RESOLVE program. Once Plaintiff commenced proceedings before the Commission on Human Rights and Opportunities ("CHRO"), Defendant attempted to stay those proceedings so that the RESOLVE dispute resolution could be instituted which it claims was at least initially mandated.

## II.    STANDARD OF REVIEW:

A party moving for summary judgment must establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'" Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir. 2002), citing Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the nonmoving party's claim." Legg v. Dellavolpe, 228 F. Supp. 2d 51, 56 (D. Conn. 2002), citing

5

Celotex, 477 U.S. at 322.  In determining whether a genuine issue has been raised, all

ambiguities are resolved and all reasonable inferences are drawn against the moving party.

United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962); Quinn

v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980).  Summary judgment

is proper when reasonable minds could not differ as to the import of evidence.  Bryant v.

Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  "Conclusory allegations will not suffice to create a

genuine issue." Delaware & H. R. Co. v. Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

Determinations of the weight to accord evidence or credibility of witnesses are improper on a

motion for summary judgment as such are within the sole province of the jury.  Hayes v. N.Y.

City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).

**III.    DISCUSSION:**

   A.     Disability-Based Claims:

The ADA provides that no "covered entity[4] shall discriminate against a qualified

individual with a disability because of the disability of such individual in regard to job

application procedures, the hiring, advancement, or discharge of employees, employee

compensation, job training, and other terms, conditions, and privileges of employment."  42

U.S.C. § 12112(a).  As such, an employer must make "reasonable accommodations to the known

physical or mental limitations of an otherwise qualified individual with a disability who is an

applicant or employee, unless such covered entity can demonstrate that the accommodation

would impose an undue hardship on the operation of the business of such covered entity."  42

U.S.C. § 12112(b)(5)(a).  Similarly, an employer must not deny "employment opportunities to a

---

[4]        There is no dispute over whether Defendant is a covered entity under the statute.

job applicant or employee who is an otherwise qualified individual with a disability, if such

denial is based on the need of such covered entity to make reasonable accommodation to the

physical or mental impairments of the employee or applicant" or use qualification standards "that

screen out or tend to screen out an individual with a disability or a class of individuals with

disabilities unless the standard, test or other selection criteria, as used by the covered entity, is

shown to be job-related for the position in question and is consistent with business necessity."  42

U.S.C. § 12112(b)(5)(b)-(b)(6).  And finally, the ADA prohibits "failing to select and administer

tests concerning employment in the most effective manner to ensure that, when such test is

administered to a job applicant or employee who has a disability ... such test results accurately

reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test

purports to measure, rather than reflecting the impair[ment] (except where such skills are the

factors that the test purports to measure)."   42 U.S.C. § 12112(b)(7).

     In analyzing a discriminatory discharge claim under the ADA, courts must apply the

burden-shifting analysis established by the Supreme Court in <u>McDonnell Douglas Corp. v.

Green,</u> 411 U.S. 792, 802-04, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973).  <u>Heyman v. Queens

Village Comm. for Mental Health for Jam. Community Adolescent Program, Inc.,</u> 198 F.3d 68,

72 (2d Cir. 1999).

> Under McDonnell Douglas, plaintiff bears the initial burden of proving by a
> preponderance of the evidence a prima facie case of discrimination. ... The burden of
> production then shifts to defendants, who must offer through the introduction of
> admissible evidence a non-discriminatory reason for their actions that, if believed by the
> trier of fact, would support a finding that unlawful discrimination was not a cause of the
> disputed employment action. ... Plaintiff then must show that the proffered reason was
> merely a pretext for discrimination, which may be demonstrated either by the presentation
> of additional evidence showing that the employer's proffered explanation is unworthy of
> credence, or by reliance on the evidence comprising the prima facie case, without more.

Id. (internal citations and quotation marks omitted).

In order to establish a prima facie case under the ADA, a plaintiff must show (1) that his or her "employer is subject to the ADA;" (2) he or she "was disabled within the meaning of the ADA;" (3) he or she "was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation;" and (4) he or she suffered "adverse employment action because of his disability." Cameron v. Cmty. Aid for Retarded Children, Inc., 335 F.3d 60, 63 (2d Cir. 2003). For one to be disabled under the ADA means to have

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

Plaintiff alleges both that she has a qualifying impairment or that she was regarded as having such an impairment.

### 1.    Actual Disability:

"Merely having an impairment does not make one disabled for purposes of the ADA." Toyota Motor Mfg., Ky. v. Williams, 534 U.S. 184, 195, 122 S. Ct. 681; 151 L. Ed. 2d 615 (2002) (citation omitted). "To qualify as disabled, a claimant must further show that the limitation on the major life activity is 'substantial.'" Id (citation omitted). To be substantially limited means "unable to perform a major life activity that the average person in the general population can perform; or significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that

same major life activity." Id. at 195-96 (citation and quotation marks omitted). In order to determine whether a condition amounts to a substantial limitation, courts should consider "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment." Id. at 196 (citation omitted).

A major life activity involves "activities that are of central importance to daily life" or those "basic abilities" such as "walking, seeing, and hearing -- the manual tasks in question must be central to daily life." Id. at 197. Whether a condition is a substantial impairment of a major life activity must be "interpreted strictly to create a demanding standard for qualifying as disabled[,]" as Congress did not intend "everyone with a physical impairment that precluded the performance of some isolated, unimportant, or particularly difficult manual task to qualify as disabled...." Id. Mere evidence of a medical diagnosis of an impairment is insufficient and an individualized evidentiary inquiry must be made in order to determine the nature and the extent of the impairment as it pertains to the claimant's personal experience. See Id. at 198-99 (discussing how carpal tunnel syndrome symptoms can vary from person to person and does not always amount to an impairment under the ADA).

As stated, Plaintiff suffers from sciatica and asserts three ways in which she is limited by this condition: standing for long periods of time, difficulties sitting for long periods of time which she alleges affects her ability to drive and sit at a desk, and having to undergo physical therapy which limits her ability to work normal hours. Pl. Mem. Opp. Summ. J. at 9. Initially, it is difficult to understand how being limited in one's ability to work normal hours because of the need to attend physical therapy is itself a substantial limitation within the meaning of the ADA.

9

At best, it is a byproduct of having a substantial limitation, not a limitation itself. Plaintiff, however, seems to abandon this as a limitation in her sur-reply which focuses only on limitations regarding her ability to sit, stand, or drive. Pl. Sur-reply at 1.[5]

As to driving, the Second Circuit has stated that driving is not a major life activity. See Felix v. N.Y. City Transit Auth., 324 F.3d 102, 106 (2d Cir. 2003) ("driving is not considered a major life activity), citing Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 643 (2d Cir. 1998) (Plaintiff "also identified a number of activities that cannot reasonably be deemed major" life activities, "such as driving"). Plaintiff's attempt to distinguish these cases is unavailing. See Pl. Sur-reply at 3-4. In Lovejoy-Wilson v. NOCO Motor Fuel, Inc., the Second Circuit allowed the plaintiff to survive summary judgment not because driving is a major life activity, but because epilepsy had already been established as a substantial impairment and did not address which major life activity it impaired. 263 F.3d 208, 216 (2d Cir. 2001); see also Felix, 324 F.3d at 106 n. 1 (noting this distinction). Thus, the question of whether driving is a major life activity was never reached and there is no reason to question prior precedent. Plaintiff's reliance on Lovejoy-Wilson is therefore misplaced. Accordingly, there is no need to consider the nature of severity of the restriction and Plaintiff's difficulty driving does not create a question of fact regarding her status as disabled under the ADA.

Sitting is a major life activity. Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 870 (2d Cir. 1998); see also Colwell, 158 F.3d at 642. Plaintiff's deposition testimony supports the conclusion that she is unable to sit for long periods of time without needing to stand up and walk

---

[5]    To the extent Plaintiff is arguing that her other alleged limitations impair the major life activity of working, it is clear that her need to attend rehabilitation sessions is not in itself a significant limitation, as the sessions only lasted 10 weeks. Def. Reply Br. at 2 n. 2.

around periodically.  Pl. Mem. Opp. Summ. J. at 9, Exh. N, Kossof Depo. at 99-104.  This

evidence, however, is simply insufficient to support a conclusion that her difficulties sitting for

long periods significantly restricts her "as compared to the condition, manner, or duration under

which the average person in the general population can perform that same major life activity[,]"

Toyota, 534 U.S. at 195-96.  In fact, Plaintiff specifically testified that she wouldn't sit for long

periods of time at work to begin with, as she was able to get up often, even stating that she could

sit comfortably in the office because of this fact.  Pl. Mem. Supp. Summ. J., Exh. N at 99.  The

case is similar to Colwell where the plaintiff failed to show that his inability to sit or stand for

long periods of time was a substantial limitation because he was able to keep moving.  158 F.3d

at 644.  Plaintiff's reliance on Abbasi v. Herzfeld & Rubin, P.C., 94 Civ. 2809 (RLC), 1995 U.S.

Dist. LEXIS 6629 (S.D.N.Y. May 17, 1995) is not helpful as the court there was dealing with a

motion to dismiss and did not make the sort of evidentiary inquiry necessary on summary

judgment.  While Plaintiff may have some limitations and sciatica may indeed cause substantial

limitations as to sitting in others, she has not demonstrated such a limitation here and a

reasonable jury could not find otherwise.

     The only remaining basis upon which Plaintiff asserts an actual disability under the ADA

has to do with her troubles standing, which are based on the disk disintegration caused by

sciatica.  Pl. Mem. Opp. Summ. J. at 9.  In her brief, Plaintiff cites only to her deposition

testimony regarding her difficulty standing for "long shots."  Pl. Mem. Opp. Summ. J., Exh. N at

99.  Plaintiff's difficulties here are identical to those with respect to sitting - the evidence

provided is insufficient to make any determination as to her abilities vis à vis an average person.

The mere fact that she has difficulty standing for "long shots" does not itself create a question of

fact on this issue.  A reasonable jury could not find, without more, that such a limitation was

substantial or anything more than the average person faces when forced to stand for long periods.

Accordingly, Plaintiff fails to make out a prima facie case of actual disability based on the

record at hand.  Defendant's Motion is **granted** on any actual disability claims alleged in Count

Two of Plaintiff's Amended Complaint.

### 2.    Regarded-As Disability:

In order to recover under a regarded as disabled theory, a plaintiff must be able to

demonstrate that their employer viewed them as having a disability within the meaning of the

ADA, as discussed above.  Sutton v. United Air Lines, 527 U.S. 471, 489, 119 S. Ct. 2139, 144

L. Ed. 2d 450 (1999).  There are two ways in which one may meet this standard: "(1) a covered

entity mistakenly believes that a  person has a physical impairment that substantially limits one or

more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting

impairment substantially limits one or more major life activities."  Id.  In either case, "it is

necessary that a covered entity entertain misperceptions about the individual -- it must believe

either that one has a substantially limiting impairment that one does not have or that one has a

substantially limiting impairment when, in fact, the impairment is not so limiting."  Id. (citation

omitted).  An employer is free to decide that "some limiting, but not *substantially* limiting,

impairments make individuals less than ideally suited for a job."  Id. at 491 (emphasis in

original).  Thus, "the mere fact that an employer is aware of an employee's impairment is

insufficient to demonstrate either that the employer regarded the employee as disabled or that that

perception caused the adverse employment action."  Reeves v. Johnson Controls World Servs.,

140 F.3d 144, 153 (2d Cir. 1998) (citation omitted).  To make out this claim, a plaintiff must

establish that she was regarded as significantly restricted in the ability to perform "either a class

of jobs or a broad range of jobs" and in this sense, the "inability to perform a single, particular

job does not constitute a substantial limitation in the major life activity of working." Cameron v.

Cmty. Aid for Retarded Children, Inc., 335 F.3d 60, 64-65 (2d Cir. 2003) (citations omitted).

It is not immediately clear which major life activity Plaintiff alleges Defendants perceived

her as being substantially impaired.  Plaintiff cites to the fact that Defendant arranged for her to

work from home and to work flex time to accommodate her driving limitations and need for

physical therapy as well as the fact that she wore a back brace and took pain medication

"presumably" in front of her co-workers to demonstrate that Defendant perceived Plaintiff as

disabled.  Pl. Mem. Opp. Summ. J. at 10.  Nowhere however does Plaintiff make a specific

argument concerning which major life activity Defendants saw her as unable to perform.

Looking to the major life activity impairments alleged as to her actual disability claim, it is clear

that driving is not a major life activity and, to the extent that a sitting impairment is alleged, the

bulk of the evidence Plaintiff marshals regarding the accommodations Defendant made center on

limiting Plaintiff's driving requirements, not sitting itself.  There is no real evidence, even

considering that Defendant was aware of Plaintiff's back problems, that Defendant thought

Plaintiff substantially impaired when it came to sitting or standing in a work setting (as opposed

to simply driving).  As Plaintiff herself notes, the reference to "health and commuting issues"

was made in regards to the physical location of Plaintiff's work and placing her somewhere new,

given her commuting difficulties, not her ability to sit or stand once at a particular location.  See

Pl. Sur-Reply at 7.  To the extent that the commuting difficulties go to a broader limitation

affecting her ability to work in general, there is no evidence that Defendant saw Plaintiff as

13

unable to participate in "either a class of jobs or a broad range of jobs" only that she could not

drive long distances to get to work. <u>Cameron</u>, 335 F.3d at 64. There is nothing in the record

before the Court to suggest that being unable to commute long distances has anything to do with

her ability to actually perform in the workplace as there is no indication that being able to drive

long distances was in any way a job requirement of this job or any class of jobs at stake.

 To the extent that Plaintiff argues Defendant's accommodation of Plaintiff's

rehabilitation schedule and allowing her to work flex time suggests a substantial impairment in

the major life activity of working, this argument fails as well. As stated above, Plaintiff's

rehabilitation lasted only 10 weeks and as such accommodating this a schedule could not

reasonably amount to a evidence of a perception of a substantial impairment of her ability to

work. Plaintiff claims that Defendant allowed her to work flex time "because of ... the

knowledge of her wearing a back brace and her diagnosis of sciatica." Pl. Mem. Opp. Summ. J.

at 10. Again, there is no evidence to suggest that this was done for any reason other than to

lessen Plaintiff's commuting burden, which does not impact her ability to work itself and driving

is not a major life activity for the purposes of the ADA. <u>Felix</u>, 324 F.3d at 106. There is

therefore no indication that Defendant believed, erroneously or otherwise, that Plaintiff was

incapable or substantially limited in her ability to work. <u>See</u> Pl. Mem. Opp. Summ. J., Kossof

Depo., Exh. N at 96-97 (Explaining that the reason for her flex time was her difficulty driving).

 Accordingly, Plaintiff does not present a question of fact sufficient to defeat Defendant's

Motion on the issue of her regarded as disabled claim and summary judgment is **granted** on that

claim. Accordingly, summary judgment is **granted** on the entirety of Count Two in the

Amended Complaint.

14

B.     Age Discrimination:

Plaintiff also raises an age discrimination claim.  Age discrimination claims are also analyzed under the same burden shifting framework, contingent upon the plaintiff first establishing a prima facie case, at which point

> the employer is required to offer a legitimate, nondiscriminatory business rationale for its actions.  If the employer articulates such a reason, the plaintiff has the burden of proving that his age was the real reason for his discharge.

Schnabel v. Abramson, 232 F.3d 83, 87 (2d Cir. 2000) (citations omitted).  In order to establish a prima facie case, under the ADEA, a claimant must demonstrate that: 1) she was within the protected age group; 2) she was qualified for the position; 3) she was subject to an adverse employment action; and 4) the adverse action occurred under circumstances giving rise to an inference of discrimination.  Terry v. Ashcroft, 336 F.3d 128, 137-138 (2d Cir. 2003).

### a.     Contracts Manager Position:

Plaintiff alleges that she was denied the Contracts Manager position on the basis of her age.  Defendant contends that she was denied the position because she does not have the paralegal training or experience that was a requirement for the position.  As a consequence, Defendant argues Plaintiff was not qualified for the job and fails to make out a prima facie case, as well as offers this evidence as a nondiscriminatory reason for its actions.  Def. Mem. Supp. Summ. J. at 15-17.

When it comes to hiring and job performance criteria, "[a]bsent a showing by the plaintiff that the employer's demands were made in bad faith ... an employer who is sued on allegations of age discrimination is not compelled to submit the reasonableness of its employment criteria to the assessment of either judge or jury."  Thornley v. Penton Publ., 104 F.3d 26, 29 (2d Cir.

15

1997). In most circumstances, "in order to establish a prima facie case of discrimination, [a plaintiff] must show that she met the defendant's criteria for the position." Williams v. R.H. Donnelley, Corp., 368 F.3d 123, 127 (2d Cir. 2004). Plaintiff argues that the paralegal training requirement was made in bad faith to exclude her from eligibility for the position. Pl. Mem. Opp. Summ. J. at 10.[6] In support of her contention, Plaintiff alleges the following facts.

Plaintiff was told that in addition to not having a paralegal degree, she was not qualified for the position because she did not have experience participating in negotiating contracts. Pl. Mem. Opp. Summ. J. at 11. Plaintiff, however, alleges that there was no substantive difference between her job and the Contracts Manager position in terms of actual work performed and that Wright, the younger woman chosen to fill the position, did not have experience negotiating contracts (although she did have a paralegal experience and schooling). Id. Furthermore, Plaintiff alleges that she trained Wright for three months and actually performed the job, without the assistance of paralegals, while Wright was on maternity leave with no difficulty at all. Id. at 11-12. Based on these allegations, Plaintiff argues that she was qualified, and Wright was not significantly more qualified than she was (i.e. Wright had a paralegal degree, but did not have experience negotiating contracts), and that this serves as evidence that the requirements were made in bad faith and that Defendant's legitimate reason is pretext for a discriminatory motive,

---

[6]      Plaintiff relies on the Supreme Court's decision in Griggs v. Duke Power Company for the proposition that "[i]f an employment practice which operates to exclude [members of a protected group] cannot be shown to be related to job performance, the practice is prohibited." 401 U.S. 424, 431 (1971). While it is not clear that Second Circuit precedent is inconsistent with this stricture, the Court in Griggs looked to how educational requirements systematically operated to exclude African Americans. Id. at 430-31. There has been no such suggestion here that requiring a paralegal degree works to exclude age protected individuals and effect age discrimination. Thus to the extent that the rules differ, the Second Circuit's requirement that Plaintiff show bad faith is the correct standard in the case at hand.

namely the desire to hire someone younger and force Plaintiff out. Id. at 12-13.

"When a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer, that discrepancy must bear the entire burden of allowing a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that the pretext served to mask unlawful discrimination." Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 103 (2d Cir. 2001). In other words, "the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." Id. (citation and quotation marks omitted). Plaintiff has made no such showing here. There is no evidence of age discrimination beyond the age of Wright, which considered in light of the other evidence (or lack thereof), simply does not create a strong enough inference of age discrimination to reach a jury. While Plaintiff may indeed have been capable of performing the duties of the Contracts Manager, this is not the determinative inquiry. See Dister v. Continental Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988) (Stating, with respect to a pretext analysis, that "[e]vidence that an employer made a poor business judgment ... generally is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons"); Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986) (A court "does not sit as a super-personnel department that reexamines an entity's business decisions"). A reasonable juror could not conclude that Plaintiff was discriminated against on the basis of her age from the evidence presented.

b.     Denial of a Raise for 2002:

Plaintiff alleges that she did not receive a raise in 2002 and this action was

discriminatory.  Defendant contends that Plaintiff's position as Manager of Support Services was equivalent to that of a Portfolio Administration Representative ("PAR") and that her salary was more than double that of the average PAR.  Def. Mem. Supp. Summ. J. at 17.  Apparently not arguing the question of a prima facie case, Defendant offers two legitimate nondiscriminatory business reasons for its actions, namely, that Plaintiff did not receive a raise because it knew Plaintiff's position would be eliminated and that her salary was so high to begin with, a raise was not appropriate.  Id. at 17.

Plaintiff takes issue with this, arguing that her position being eliminated was not offered as a reason until after the fact and that the only original explanation was that her salary was already too high.  Pl. Surreply at 11.  With respect to this explanation, Plaintiff contends that her position was not appropriately compared to a PARS position and she was therefore entitled to the scheduled raise.  Pl. Mem. Opp. Summ. J. at 13.  Plaintiff compares herself to Wright, a younger employee, whom she alleges is similarly situated and did receive a raise.  Pl. Surreply at 12.

Plaintiff's argument then hinges on creating an inference of discrimination based on her disparate treatment.  In such instances, a plaintiff must be able to demonstrate that those to whom she is comparing herself were similarly situated in all material respects.  See Shumway v. UPS, 118 F.3d 60, 64 (2d Cir. 1997) (holding in a gender discrimination case that the plaintiff must show herself treated differently than similarly situated males).  Defendant contends that Wright is not similarly situated because her position involved supervising subordinates, which Plaintiff's did not, and therefore they are not similarly situated for salary adjustment purposes.  Def. Reply Br. at 7. This is, indeed, a fairly substantial difference in positions and Wright and Plaintiff cannot be considered similarly situated based on the record before the Court.  There is no other

18

indication that younger individuals similarly situated to Plaintiff were treated better and there is therefore no reason to assume, even if one discounts Defendant's explanation that her position was soon to be eliminated, that the salary comparison explanation is pretext for discriminatory purposes. Outside the bare fact that a younger non-similarly situated employee did receive a raise, which is not enough in itself, Plaintiff presents no evidence tending to connect her treatment to her age and there is simply no reason to infer age discrimination at all. Accordingly, summary judgment is **granted** on any age discrimination claim based on salary discrepancies.

c.    VIC Bonus for 2001:

Plaintiff was terminated on February 1, 2002. She alleges that she did not receive the Variable Incentive Compensation ("VIC") bonus to which she was entitled. She did, however, receive what was referred to as a "stay" bonus. Defendant maintains that this was a VIC bonus, simply named a stay bonus for the sake of getting the money to her faster by going outside of the VIC process. Def. Mem. Supp. Summ. J. at 19-20. Plaintiff maintains that it was a stay bonus for her work just prior to being terminated and that she did not receive a VIC bonus, but was entitled to one. Pl. Mem. Opp. Summ. J. at 15. Plaintiff further maintains that her "replacement" a non-age protected employee received a VIC bonus that was almost three times Plaintiff's stay bonus. Id.

While, it is unclear whether Defendant's argument is meant to contest that Plaintiff suffered an adverse employment action or to offer a legitimate nondiscriminatory reason for its action it remains equally unclear how any of this amounts to age discrimination and Plaintiff fails to meet her burden on either account. While Plaintiff points to irregularities in Defendant's handling of this bonus, i.e. calling it a stay bonus when it was apparently meant to be a VIC

19

bonus, there is still nothing in the record to suggest that it had anything to do with her age. While Wright received a bonus, it has already been established that it is not appropriate to compare Wright to Plaintiff, as they were not similarly situated and Wright's position involved responsibilities that Plaintiff did not have (Plaintiff's belief that she could perform both positions not withstanding). Plaintiff has not even established that she was entitled to a VIC bonus or explained under what conditions one is supposed to receive the bonus. Accordingly, Defendant's Motion is **granted** on any claim arising from Plaintiff's alleged entitlement to a VIC bonus.

d.    Termination:

Plaintiff contends that she was terminated in February 2002 on account of her age. Defendant argues that Plaintiff was terminated because there simply wasn't a position for her. Defendant argues that after Plaintiff's position as Director of Contracts was eliminated it "manufactured" a position, the support services position, for her rather than terminate her employment and that once her work in that position was completed, when the files were transferred, there simply wasn't a place for her at the company. Def. Mem. Supp. Summ. J. at 23. Defendant also argues that the individual who made the decision that led to Plaintiff's termination, Bill Duffek, had never even met Plaintiff and was unaware of her age. Id. at 22.

Plaintiff's evidence that this termination was discriminatory centers on the argument that from the time she was "demoted" from the Contracts Manager position, Defendant intended to terminate her and that at the same time, it brought in a non age-protected person to replace her. Pl. Mem. Opp. Summ. J. at 17. Plaintiff maintains that Defendant never intended her position to last more than two years and did not inform her of this fact. Id. Moreover, when she was terminated, she was not given information about other open positions within the company and

20

other younger employees were.  Id.  Finally, Plaintiff states that while she was allowed to work from home for a period, Defendant's stated reason for discontinuing the practice, namely that it was impossible to tell if she was actually working, was untrue and that her work patterns were able to be remotely monitored.  Id. at 17-18.

Only two of Plaintiff's allegations suggest the possibility of age discrimination: that she was "replaced" by a younger individual (Wright) and that she was not provided with information regarding other possible opportunities for employment with Defendant.   As to Wright, the position she filled was not Plaintiff's but a new position.  Although, Plaintiff maintains Defendant acted purposely to force Plaintiff out, as discussed above, Plaintiff has failed to create a question as to whether the qualifications added were motivated by discriminatory purposes.  Thus, for the same reasons, it is difficult to see now why on this record Wright's hiring suggests age discrimination.

With respect to providing assistance to younger employees and not Plaintiff, Defendant counters that this assistance was only provided to those affected by the acquisition of Phoenixcor and corresponding layoffs in the year 2000.  Def. Reply Br. at 8-9, citing Cherry Aff. ¶ 2.[7] Plaintiff points to the fact that Cherry's testimony on this subject is arguably inconsistent having stated at her deposition that Defendant did not give any such assistance to other employees.  Pl. Surreply at 13, citing Pl. Mem. Opp. Summ. J., Exh. P, Cherry Depo. at 146.  While the two statements are arguably reconcilable, it is not the place of this Court to make such reconciliation at summary judgment.

---

[7]     Plaintiff states that Defendant did not provide the Cherry Affidavit with its Motion.  Pl. Surreply at 13.  The Court has a copy of the Affidavit [Doc. No. 46], which is part of the file and therefore the basis for Plaintiff's statement is unclear.

Nevertheless, this evidence alone would not support an inference of discrimination strong enough for a rational jury to base a verdict in favor of Plaintiff.  Plaintiff points to two employees who received treatment two years prior that she did not subsequently receive.  It is not clear from the papers whether those two individuals were similarly situated to Plaintiff, although the positions certainly seem related, but the time gap is simply too great to support such an inference here.  Accordingly, Plaintiff fails to meet her burden to create a question on the discriminatory nature of her termination and summary is **granted** for Defendant.  As a consequence, summary judgment is **granted** in its entirety on Count One of the Amended Complaint.

C.      Common Law Claims:

Plaintiff asserts three common law clams, one based on a breach of the covenant of good faith and two fraud based claims: negligent misrepresentation and fraud itself.

1.      Breach of Covenant of Good Faith:

Every contract implies a covenant of good faith and fair dealing.  De La Concha of Hartford, Inc. v. Aetna Life Ins. Co., 269 Conn. 424, 432, 849 A.2d 382, 387 (2004), citing Magnan v. Anaconda Industries, Inc., 193 Conn. 558, 566, 479 A.2d 781 (1984).  To constitute a breach of the implied covenant of good faith and fair dealing, "the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith."  Id. at 433, 849 A.2d at 388.  Bad faith means more than simply negligence, it implies "implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive."  Id.

22

Plaintiff bases her allegation of such a breach on Defendant's attempt to invoke the RESOLVE process and stay or postpone the Commission on Human Rights and Opportunities ("CHRO") investigation. Pl. Mem. Opp. Summ. J. at 17-18; see also Id. at Exh, M. Plaintiff contends that she did not have notice of the RESOLVE plan and that even if she had "she was under no obligation to pursue the process prior to filing a complaint with the CHRO." Id. at 18. Plaintiff further argues that for Defendant to represent that the program was mandatory and that she must pursue it prior to pursuing state and federal remedies "shows its dishonest purpose." Id.; see also Pl. Surreply at 14.

Based on the undisputed facts before the Court, by its terms RESOLVE would have mandated that Plaintiff at least complete the first three levels of the process before pursuing other options. Pl. Reply Br. at 9; see also Cherry Aff. ¶ 3, Exh. A at 134. Plaintiff's only possible evidence of any bad faith is that Ms. Cherry, Manager of Human Resources, could not state definitively during her deposition whether the RESOLVE process was mandatory for Plaintiff. Pl. Surreply at 14. Coupling this with Defendant's attempt to force Plaintiff into the RESOLVE process, Plaintiff argues bad faith. Even assuming these facts to be true, it does not amount to evidence that Defendant was doing anything but trying to assert rights that it believed it had under the RESOLVE program that are based on what would seem a permissible reading of the program manual. See e.g. Labbe v. Hartford Pension Comm'n, 239 Conn. 168, 197, 682 A.2d 490, 504 (1996) (By itself, an error interpreting a contract is not bad faith). There is no evidence that would support a finding of bad faith, or something other than advancing a colorable legal strategy, by a reasonable jury. Notably, Cherry's inability to recall the details of the program would seem irrelevant, given that it was counsel's decision to pursue the litigation strategy, not

Defendant's employee.  Accordingly, summary judgment is **granted** on Count Three of the

Amended Complaint.

>    2.    Fraud Based Claims:

In order to recover under a theory of fraud, Plaintiff must be able to demonstrate "(1) that

a false representation was made as a statement of fact; (2) that it was untrue and known to be

untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4)

that the latter did so act on it to his injury."  Updike, Kelly & Spellacy, P.C. v. Beckett, 269

Conn. 613, 643, 850 A.2d 145, 166 (2004).  A claim for negligent misrepresentation is similar

except that a plaintiff "need not prove that the representations made by the defendants were

promissory, but only that they contained false information[,]" Daley v. Aetna Life & Cas. Co.,

249 Conn. 766, 793, 734 A.2d 112, 128 (1999), and one can recover simply if the supplier of the

false information failed "to exercise reasonable care or competence in obtaining or

communicating the information" so long as the plaintiff justifiably relied on the statement.

Beverly Hills Concepts v. Schatz & Schatz, 247 Conn. 48, 57, 717 A.2d 724, 730 (1998).

Defendant argues that Plaintiff cannot demonstrate the falsity of any representation or

detrimental reliance on it.

>    a.    Qualifications for Contracts Manager Position:

Plaintiff again raises the issue of whether a paralegal degree was truly necessary for the

Contracts Manager position Wright filled.  Pl. Mem. Opp. Summ. J. at 19.  The only evidence

Plaintiff puts forth to support her contention that the qualification was not necessary and that

Defendant knew or failed to exercise due care in communicating this requirement is Plaintiff's

own subjective belief that she could do the job and did in fact do the job without a paralegal

degree.  Id.  This evidence is insufficient to support the inference Plaintiff seeks to draw and is

insufficient to support a reasonable verdict under a fraud or negligent misrepresentation theory.

The unrebutted evidence is that Defendant only interviewed and ultimately hired an individual

with a paralegal degree.  There is no evidence to suggest that Defendant knew the information

was false or failed to exercise care in stating as its business judgment that this qualification was

necessary.  Defendant may have been wrong that a paralegal degree was required, but this by

itself does not make fraud.  Accordingly, summary judgment is **granted** on this claim.

> b.    Telecommuting:

Plaintiff alleges fraud in that she was told she would be allowed to telecommute once a

week while working in the Support Services Manager position, but that she was later told she

would not longer be allowed to do so.  Plaintiff's brief is devoid of any evidence that at the time

Defendant stated she would be allowed to telecommute, the statement was false and that

Defendant knew this or was negligent in otherwise communicating the promise to Plaintiff.

Plaintiff seeks to cast doubt on the veracity of Defendant's statements by merely pointing to the

fact that Defendant has arguably wavered in its explanation for discontinuing Plaintiff's

telecommuting.  Pl. Mem. Opp. Summ. J. at 20.  This does not reasonably support the inference

that the statement was false at the time it was made.  See Daley, 249 Conn. at 793, 734 A.2d at

128 (even under negligent misrepresentation, Plaintiff must prove falsity).  Plaintiff's only other

theory is that Defendant did not intend the position to be permanent so therefore, the promise to

allow her to telecommute one day a week was false.  Pl. Mem. Opp. Summ. J. at 20.

To the extent that Plaintiff is suggesting that these alleged promises were of an indefinite

nature and therefore actionable under a fraud theory no matter how remote in time Defendant's

deviation from the promise may be, this position is untenable.  An open ended promise, much like employment at will, does not mean permanent.  See Burnham v. Karl & Gelb, P.C., 252 Conn. 153, 158-59 (Conn. 2000) (Contracts of permanent employment, or for an indefinite term, are terminable at will).  Plaintiff does not dispute that she was permitted to telecommute for at least a year, thus Plaintiff seeks to transform the promise to allow her to telecommute into a permanent guarantee that she would be allowed to so - in effect a contract.  This is entirely different from a fraud claim.   Plaintiff presents no evidence that Defendant promised to allow her to telecommute in perpetuity, which would be necessary to establish the falsity of the statement.  The undisputed evidence establishes that no time frame was specified and that Defendant did in fact permit her to telecommute for a significant period of time.  Therefore, Plaintiff cannot establish the falsity of Defendant's representation when made and summary judgment is **granted** on this claim.

In a related claim, Plaintiff maintains that the mere fact that the position turned out to be temporary was fraudulent because she was not told the position was temporary and alleges Defendant knew that is was.  Pl. Mem. Opp. Summ. J. at 21.  Plaintiff's contention that she was misled is, however, fundamentally flawed in that there is no indication she was ever told the position was permanent.  Even assuming Defendant knew the position would be temporary, Plaintiff was never told otherwise.  Plaintiff's only evidence for the alleged misrepresentation is Edel's deposition testimony that she was not told the position would be temporary (he of course maintains no one knew it would be).  Pl. Mem. Opp. Summ. J., Exh O, Edel Depo. at 88.  This does not amount to a representation that the position would be permanent.  Accordingly, no fraud claim can stand and summary judgment is **granted**.

26

c.    Compensation:

Plaintiff argues that Defendant defrauded her when she was told her reassignment to the position of Support Services Manager would not adversely impact her compensation.  As discussed above, she alleges that she did not receive the raise she claims she expected or the bonus that she would have otherwise expected.  Pl. Mem. Opp. Summ. J. at 20-21.  An expectation is not a commitment.  Defendant, argues that there was no reduction in her salary and that she did receive a raise and a bonus.  It does not argue that she was not told her compensation would be unaffected.  Def. Mem. Supp. Summ. J. at 29-30.  It does argue that the individual who told Plaintiff her compensation would be unchanged (which he base salary did) did not represent what her future salary would be and did recommend that she receive a raise in 2002.  Thus so the statement could not have been false.  Id. at 30.

Even leaving aside the questionable falsity of Defendant's statement (i.e. it is unclear whether the representation referred to her current salary or future salary), Plaintiff has made no showing that she relied on the asserted misrepresentation to her detriment.  She took the Support Services Manager position.  As her old position was no longer existent, taking the position could not have been to her detriment.  She makes no showing that she turned down or failed to explore available alternatives.  As Defendant has pointed out, it attempted to keep her employed, presumably to her benefit, by maintaining her employment, at an equivalent base salary.  See Def. Mem. Supp. Summ. J. at 18 (Defendant "constructed ... a job for her ... rather than issue her a layoff notice").  Plaintiff cannot therefore show that she relied to her detriment on any misrepresentation which affected her compensation.  Summary judgment is therefore appropriate and **granted**.  As a result of the foregoing, summary judgment is **granted** as to Counts Four and

27

Five of the Amended Complaint.

## IV.    CONCLUSION:

For the reasons stated herein, Defendant's Motion for Summary Judgment is **granted** on all counts.  The Clerk shall close the file.

SO ORDERED.

Dated at New Haven, Connecticut, February  11 , 2005.

_____
/s/
Peter C. Dorsey, U.S. District Judge
United States District Court